In the

# United States Court of Appeals

## For the Seventh Circuit

No. 08-2044

BRIAN NELSON,

*Plaintiff-Appellant,*

*v.*

CARL MILLER,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Southern District of Illinois.
No. 03-C-254—**Clifford J. Proud**, *Magistrate Judge.*

ARGUED FEBRUARY 25, 2009—DECIDED JULY 1, 2009

Before FLAUM, WILLIAMS, and TINDER, *Circuit Judges.*

FLAUM, *Circuit Judge.* Illinois prisoner Brian Nelson sued Chaplain Carl Miller in his official and individual capacities for alleged violations of his rights under the free exercise and establishment clauses of the First Amendment, the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), and the Illinois Religious Freedom Restoration Act ("IRFRA"). Nelson requested declaratory and injunctive relief as well as monetary damages.

Magistrate Judge Clifford Proud entered partial summary judgment in favor of defendant, and, after a bench trial on the remaining issues, found against Nelson on all counts. Nelson appeals. For the reasons explained below, we affirm in part, reverse in part, and remand for further proceedings.

## I. Background

### A. Factual History

The relevant facts are undisputed by the parties.

Brian Nelson is a prisoner at Tamms Correctional Center, a "super max" prison located in Tamms, Illinois. Tamms Institutional Directive 04-25-101, § II(I)(1) provides that "[c]ommitted persons shall be permitted to abstain from any foods the consumption of which violates their required religious tenets." Requests for a religious diet must be in writing, give specific details as to the applicable religious tenets involved, and be confirmed by a faith representative. The Directive states that "[s]hould further review [of the dietary request] be needed, the facility chaplain and the religious faith representative may interview the committed person."

When Nelson was incarcerated in 1983, he formally designated himself a Catholic. In the late 1990s, plaintiff took a greater interest in his faith. In accordance with Nelson's understanding of Catholicism, there are three methods of penance: giving alms, works of charity, and acts of abstinence. Given his incarceration, plaintiff reasoned that the only ways he could engage in penance

were prayer and abstaining from eating meat. Thus, upon arriving at Tamms in 1998, plaintiff requested a meatless diet on Fridays throughout the year as an act of penance.

Nelson subsequently began studying the teachings of Cistercian monks[1] and other religious orders who followed the teachings and example of St. Benedict. (St. Benedict was the patron saint of plaintiff's childhood parish and school.) Plaintiff's study of St. Benedict caused him to write to Tamms Chaplain Carl Miller on April 23, 2001, requesting that, in accordance with his Roman Catholic upbringing and beliefs, he be given a diet free of "flesh meat on Fridays" as an act of penance. Plaintiff's letter indicated that Father Fortenberry, the Catholic chaplain at Tamms, supported and encouraged such acts of penance. In apparent recognition of prison dietary policies, plaintiff stated that he would accept a "vegetarian/religious no meat diet for all meals."

Tamms offers only the "regular" diet (which may or may not contain meat at any given meal), a vegan diet (containing no animal or animal by-products), and some medical diets. Due to security concerns at Tamms, special diets are kept to a minimum to prevent the introduction of contraband, and to prevent an inmate's cell

---

[1] Cistercian Monks, or the Religious of the Order of Cîteaux, are a Benedictine reform religious order. The order was established in 1098 for the purpose of restoring as far as possible the literal observance of the Rule of St. Benedict. *See* The Catholic Encyclopedia, *Cistercians*, *available at* http://www.newadvent.org/cathen/03780c.htm.

location from being identified by tracing the delivery of a special food tray. Bonnie Sullivan, the registered dietician responsible for dietary services at Tamms, explained that in 2002, the regular diet included chicken, turkey, fish and a limited amount of beef, as well as animal by-products such as eggs and cheese. Pork and pork by-products have not been included in the regular diet at Tamms since January 1999, per the warden, "in an effort to eliminate confusion related to the use of pork." Starting in 2004, beef was eliminated from the regular diet, except for beef-soy patties and beef-soy meatballs. The vegan diet contains no animal or animal by-products, and there is the option to receive either dairy or soy milk.

Defendant Miller is an ordained Lutheran minister and has been head chaplain at Tamms since January 2000. In an effort to conform with the Tamms Institutional Directives, Chaplain Miller reviewed requests for religious diets, cross-checking the inmate's declared religious affiliation to determine if a religious diet was required. Miller looked for confirmation of the religious dietary tenet "on paper"—that is, he looked for confirmation of the requirement in some "church document"—as opposed to inquiring regarding the spiritual goals of the inmate.

In a memo dated May 2, 2002, Miller denied plaintiff's request for a meatless diet all the time or on all Fridays. Miller explained, "there are many ways to do penance," and plaintiff was free to "choose to not eat meat . . . on Fridays." Miller further explained that "a religious diet without meat all the time or every Friday . . . is not re-

quired by the Roman Catholic faith nor does Jesus of God's Word command abstention from meat on Fridays for penance." Miller went on to suggest that plaintiff read "I Timothy 4:1-5,"[2] and cited other biblical passages purportedly illustrating "examples of true penance." According to Miller, abstaining from meat on Fridays did not appear in Christian scripture as an act of penance.

Miller testified that if a Christian inmate of no specific denomination (as opposed to a Catholic) requested a special diet and cited scriptural passages that supported the dietary requirement, such a diet would likely be approved, because that person would not be bound by the tenets of a particular denomination. But if a prisoner's beliefs conflicted with the traditional tenets of his declared religion, Chaplain Miller would look for written substantiation of the variation within that faith group.

Plaintiff filed an administrative grievance on May 8, 2002. Nelson complained that, as a Roman Catholic, he

---

[2] 1 Timothy 4:1-5 states:

> Now the Spirit explicitly says that in the last times some will turn away from the faith by paying attention to deceitful spirits and demonic instructions through the hypocrisy of liars with branded consciences. They forbid marriage and require abstinence from foods that God created to be received with thanksgiving by those who believe and know the truth. For everything created by God is good, and nothing is to be rejected when received with thanksgiving, for it is made holy by the invocation of God in prayer.

was forbidden to eat "flesh meat" on Fridays and during Lent, and that non-Catholic chaplains were imposing their beliefs upon him. Plaintiff wanted a non-meat diet on Fridays and during Lent, but he again indicated his willingness to accept a vegan diet on a daily basis for the sake of Tamms's convenience. In support of his request for a religious diet, plaintiff cited a religious reference document and Father Fortenberry, the Catholic priest serving Tamms. Nelson also noted that Muslims and Buddhists at Tamms were permitted vegan diets and did not have to "eat around meat" as Nelson felt he was required to do. Plaintiff offered an alternate remedy: " 'OR' stop making special allowances for certain religions that affect all prisoners such as no pork because of Muslims!!!" Nelson's grievance was denied at the institutional level, and ultimately by the Illinois Department of Corrections Administrative Review Board.

Nelson continued his religious studies and learned that there are two different penitential dietary requirements under the Rule of St. Benedict: (1) abstention from eating the flesh of four-legged animals, which most Benedictines follow; and (2) abstention from all meat, which the Cistercian monks follow. On July 20, 2002, Nelson again wrote to Chaplain Miller, directing Miller's attention to the Rule of St. Benedict No. 39, which states that "everyone, except the sick who are very weak, [should] abstain entirely from eating the meat of four-footed animals." Plaintiff accused Miller of forcing Miller's beliefs on him, and asked that his request be presented to the Religious Advisory Board, an administrative body that advises the Illinois Department of Corrections on religious matters.

According to the testimony of both Nelson and Miller, some requests for a religious diet at Tamms are automatically granted, without providing any substantiation. For example, upon request, declared Muslims and Black Hebrew Israelites are automatically given the vegan diet. According to Miller, the practice of automatically approving such requests existed before he became Senior Chaplain. He testified that he continued the practice as a courtesy, and because of his understanding of the impracticality of preparing food in accordance with the procedures mandated by those religions. However, Miller acknowledged that not all Muslims adhere to the Muslim dietary requirement of "halal," and he stated that he considers that their choice. Miller also acknowledged that in the past he has approved vegan diets for some Buddhist inmates without a precise statement that the vegan diet was a religious requirement. Miller stated that he seeks verification when he does not know the tenets of a particular religion.

Plaintiff's July 2002 request to Chaplain Miller was unsuccessful. Plaintiff continued to appeal to Chaplain Miller, writing in August 2002 that it is his belief that eating meat on Fridays is a mortal sin. In support of his August letter, plaintiff offered Chaplain Miller a letter from Father Fortenberry indicating Fortenberry's belief that it is "permissible & highly recommended that [any Catholic] follow the diet [prescribed by the Rule of St. Benedict]." Father Dominic J. Roscioli, a personal friend of plaintiff and his family, wrote to Chaplain Miller in support of permitting plaintiff to eat a vegetarian diet based on plaintiff's Catholic faith and the Rule of St.

Benedict. Father Roscioli explained that the original Benedictines and modern Cistercians and Trappists are vegetarians, and equated plaintiff's life in prison to the life of a monk "outside the walls" of a monastery. Father Roscioli stated: "If a person truly believes that a certain diet (which is really a discipline) will lead to becoming a disciple of our Lord Jesus Christ, I pray that neither you or I would stand in the way of God's Spirit at work in that person's life." Chaplain Miller did not give the letters from Father Fortenberry and Father Roscioli any weight, choosing instead to rely on the religious documentation plaintiff submitted, which required a special diet only when living in a monastery.

Plaintiff lodged a second grievance on September 15, 2002. Plaintiff essentially complained that Chaplain Miller had denied his request for a religious diet out of ignorance, having failed to consult Father Fortenberry or the Rule of St. Benedict. Plaintiff explained that his religious beliefs—as a Catholic following the Rule of St. Benedict—forbade eating "the flesh meat of four[-]legged animals." In denying the grievance at the institutional level, prison officials noted that plaintiff had declared himself a "Catholic," and, per Chaplain Miller, until plaintiff could establish that he was a monk, he would not receive the requested vegan diet. The grievance was subsequently denied by the Illinois Department of Corrections Administrative Review Board.

In October 2002, Chaplain Miller, citing Institutional Directive 04-25-101, emphasized to plaintiff that requested dietary accommodations must be "requirement[s] of the

religion." In a memo dated April 1, 2003, from Chaplain Miller to Administrative Assistant Randy George regarding plaintiff's request for a "religious vegan diet" on Fridays and during Lent, Miller continued to assert that the Roman Catholic faith does not require abstaining from meat on Fridays, except on Fridays during Lent (which Miller approved). Chaplain Miller further reasoned that because plaintiff was not a monk, he was not required to adhere to the Rule of St. Benedict.

However, on April 12, 2006, at the explicit direction of the warden, Miller approved a vegan diet for Nelson. But Miller testified at the bench trial that he still does not believe that plaintiff should receive a vegan diet and, therefore, except for the warden's directive, he would continue to deny a vegan diet.

Nelson testified that he weighed 161 pounds when he entered Tamms. But during the time period he was denied a vegan diet, Nelson abstained from eating all meat and his weight dropped to as low as 119 pounds. According to plaintiff, he was hospitalized three times due to his weight loss; the first time during Lent in the Spring of 2002, when he abstained from all meat, and a second time about a month and a half later. However, Nelson offered no documentation or medical evidence of causation at summary judgment. In any event, Nelson testified that he felt hungry during this time period, his bones began to protrude, he was cold, and he was depressed and anxious. After Nelson began receiving the religious diet in April 2006, he was able to eat full meals again and quickly regained the weight he had lost.

Plaintiff acknowledged that he could eat chicken, turkey, fish, eggs and dairy foods and remain in compliance with the admonition in the Rule of St. Benedict against eating the meat of four-legged animals. However, plaintiff noted that often skipping the meat on his meal tray also required skipping a substantial portion of the meal, for example when spaghetti with meat sauce was served.

Dietician Bonnie Sullivan testified that if a prisoner abstained from all meat of four-legged animals, the regular diet would be nutritionally adequate. But Sullivan opined that there probably was insufficient nutrition in the regular diet plan if all meat were skipped. A menu for the spring cycle in 2004 was submitted by the defendant. Although the menu is "subject to change" and substitutions of "like items" occur, on nine days during the 91-day cycle two of the three daily meals appear to contain the meat of four-legged animals; on three of those days all three meals contain the meat of four-legged animals. There was no testimony regarding the nutritional impact of having to skip items such as spaghetti with meat sauce.

In November 2005, Nelson filed a grievance complaining that Muslims were allowed to receive the special Christmas day food but Christians were not allowed to receive special food that marked Muslim holidays. The warden and Administrative Review Board denied this grievance. According to dietician Bonnie Sullivan, the Muslim feasts amount to little more than receiving extra fruit or an extra dessert in celebration of the end of their month-long abstention from eating lunch. With respect to the Christmas meal, Sullivan

indicated it was her decision that everyone could have whatever meal was served for Christmas.

## B.  Procedural History

On February 20, 2003, Nelson filed a pro se complaint in the Circuit Court of Alexander County, Illinois. Defendants removed to federal court and the parties consented to final disposition by a magistrate judge.

Defendant moved for partial summary judgment on several grounds. Miller alleged that with regard to Nelson's Section 1983 and RLUIPA claims, Nelson had failed to exhaust his administrative remedies as required by the Prison Litigation Reform Act ("PLRA"). Although defendant conceded that Nelson had filed at least two grievances regarding his diet that had been properly appealed to the Director, he contended that plaintiff had not properly "connected the dots" by filing a final grievance which detailed his belief that he wished to abstain from all meat. (Miller did not request summary judgment for failure to exhaust as to Nelson's IRFRA claim, which was not subject to PLRA exhaustion requirements.) Regarding remedies, Miller argued that injunctive relief was moot, that damages against him in his official capacity were barred under Section 1983, RLUIPA, and IRFRA, and finally, that he was protected by qualified immunity.

In its summary judgment ruling, the district court agreed that Nelson had not exhausted portions of his Section 1983 and RLUIPA claims. The district court held that Nelson's grievances only described his religious

beliefs as requiring that he abstain from meat on Fridays and during Lent and from the flesh of four-legged animals at all times, and concluded that it would consider his free exercise claim only to that extent. As to remedies, the district court found that the Eleventh Amendment barred an award of damages against Miller in his official capacity under Section 1983 and RLUIPA but held that IRFRA allowed for damages against a state official. The district court found that it was too early to conclude whether Miller was entitled to qualified immunity.

The case was tried before the Magistrate Judge. On March 31, 2008, the Magistrate Judge issued an order finding against Nelson on all claims.

## II. Discussion

We review the district court's grant of partial summary judgment to Nelson de novo. *See Patton v. MFS/Sun Life Fin. Distribs.*, 480 F.3d 478, 485 (7th Cir. 2007). Summary judgment is appropriate only if the evidence presents no issue of material fact, so that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The moving party is entitled to summary judgment if no reasonable fact-finder could return a verdict for the nonmoving party. *See Patton*, 480 F.3d at 485 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 254 (1986) and *Gleason v. Mesirow Fin., Inc.*, 118 F.3d 1134, 1139 (7th Cir. 1997)).

In an appeal from the district court's judgment following a bench trial, "we review the district court's conclusions of law de novo, and we review its findings

of fact, as well as applications of law to those findings of fact, for clear error." *Trustees of the Chi. Painters & Decorators Pension v. Royal Int'l Drywall & Decorating*, 493 F.3d 782, 785 (7th Cir. 2007) (internal brackets, quotation marks, and citation omitted).

## A. Exhaustion

In its summary judgment opinion, the district court found that Nelson had exhausted his grievances regarding (1) his belief that he must abstain from all meat on Fridays and during Lent (the May 2002 grievance), (2) his belief that he must abstain from the meat of four-legged animals at all times (the September 2002 grievance), and (3) his complaint that he suffered discrimination because non-Christians were allowed to receive the special Christmas day food but Christians were not allowed to receive special food that marked Muslim holidays (the November 2005 grievance). The district court found that Nelson had not exhausted his request for a vegan diet based on his later-evolved belief that he must not eat any meat.[3]

Nelson does not contest the district court's ruling on exhaustion with respect to Section 1983 and RLUIPA (which are subject to the PLRA exhaustion requirements),

---

[3] Nelson's beliefs evolved to this point apparently at some time after he filed his initial complaint in this case and he did not state this new belief until he filed objections to the magistrate judge's report recommending denial of his motion for a preliminary injunction.

but argues that his IRFRA claim is not subject to those same requirements and that his IRFRA claim should thus be understood as based on his broader belief that he should abstain from all meat. Defendant defends the district court's ruling on exhaustion, even with regard to the IRFRA claim, arguing that Nelson did not describe his current belief (barring any consumption of meat) in any prison grievance.

Ultimately, this rather narrow dispute is immaterial to our analysis. The only difference it could make to this appeal is if we found that the denial of a request for a vegan diet based on Nelson's desire to abstain from all meat was a substantial burden under IRFRA while the denial of a request for a vegan diet based on Nelson's desire to abstain from the meat of four-legged animals and to avoid all meat on Fridays and during Lent was not a substantial burden under IRFRA. Because we find, as explained below, that Nelson's free exercise (including IRFRA) rights were substantially burdened by the denial of his request even on the narrower, clearly exhausted basis, we need not explore whether he exhausted the broader basis of his request at this time.[4]

---

[4] Although, as explained, it is not necessary to our analysis on the merits, if we did analyze the IRFRA exhaustion issue, it appears that Nelson sufficiently apprised defendant of his desire to receive a meatless diet to satisfy exhaustion under IRFRA. The parties agree that the governing case here is *Strong v. David*, 297 F.3d 646 (7th Cir. 2002). In that case, we observed that at the time during which Nelson filed his grievances, Illinois had not "established any rule or regulation prescribing the
(continued...)

<hr>

[4] (...continued)
contents of a grievance or the necessary degree of factual particularity." *Id.* at 650. (Defendants do not assert that Tamms had implemented such a standard at the time either.) *Strong* held that in Illinois, "[w]hen the administrative rulebook is silent, a grievance suffices if it alerts the prison to the nature of the wrong for which redress is sought." *Id.* We stated that a grievant need not "lay out the facts, articulate legal theories, or demand particular relief. All the grievance need do is object intelligibly to some asserted shortcoming." *Id.* Here, Nelson's grievances explained his religious beliefs and outlined his desire to abstain from meat on Fridays and later to abstain from the meat of "four footed animals." But Nelson also repeatedly stated that he would accept a vegetarian diet every day "to ease any burden on Tamms/IDOC" and to "ease security concerns." These statements would certainly appear to put defendant on notice that Nelson was requesting a meatless diet under *Strong*'s generous notice pleading standard. *See, e.g., Riccardo v. Rausch*, 375 F.3d 521, 524 (7th Cir. 2004) (en banc) (finding that prisoner's grievance—which stated that "[t]he administration don't [sic] do there [sic] job. [A sexual assault] should've never [sic] happen again."—although "at the border of intelligibility," sufficed to put defendants on notice of prisoner's claim that defendants failed to protect plaintiff from sexual assault) (citing *Strong*, 297 F.3d at 650). Moreover, Miller stated in response to Nelson's first dietary request that "a religious diet *without meat all the time* or every Friday . . . is not required by the Roman Catholic faith . . . ." (emphasis added), which shows that Miller understood Nelson to be requesting a meatless diet. Thus, it appears that Nelson's grievances were sufficient to put Miller on notice of Nelson's claim, under IRFRA, that he was wrongly denied a meatless diet based on his religious beliefs.

**B.   Substantial Burden: First Amendment, RLUIPA and IRFRA Claims**

Section 1983 First Amendment, RLUIPA and IRFRA claims all use the substantial burden test to determine whether a violation of a plaintiff's religious free exercise rights has occurred. Although RLUIPA and IRFRA do not define "substantial burden," both statutes have been interpreted with reference to Supreme Court free exercise jurisprudence. *See, e.g.,* 146 Cong. Rec. S7776 (daily ed. July 27, 2000) (joint statement of Senators Hatch and Kennedy indicating that Supreme Court free exercise jurisprudence was a proper interpretational guide for RLUIPA); *Diggs v. Snyder,* 775 N.E.2d 40, 44-45 (Ill. App. Ct. 2002) (using United States Supreme Court free exercise jurisprudence to determine the meaning of "substantial burden" under IRFRA).

In its order following the bench trial, the district court held that Nelson was not substantially burdened by the denial of his request for a meatless diet. Specifically, the district court found that Nelson would receive a nutritionally adequate diet if he avoided all meat of four-legged animals served in the regular diet at Tamms.

Section 3 of RLUIPA provides that:

> No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution, . . . even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive

means of furthering that compelling governmental interest.

42 U.S.C. § 2000cc-1(a). The essentially identical IRFRA states that:

Government may not substantially burden a person's exercise of religion, even if the burden results from a rule of general applicability, unless it demonstrates that application of the burden to the person (i) is in furtherance of a compelling governmental interest and (ii) is the least restrictive means of furthering that compelling governmental interest.

775 Ill. Comp. Stat. 35 § 15.

Nelson argues that his exercise of religion was substantially burdened in two ways. First, he argues that he was substantially burdened by the requirement that he provide documentation of a religious requirement in order to receive a dietary accommodation. The district court did not analyze this argument, though Nelson appears to have raised it below. Second, Nelson argues that he was substantially burdened by the denial of his requested meatless diet. Defendant argues that Nelson was not substantially burdened on either basis because his religious exercise was not rendered "effectively impracticable" by defendant's policies and conduct.

## 1. Substantial Burden: Dietary Request Procedural Requirements

Nelson contends that he was substantially burdened by the procedures for obtaining a religious accommodation;

specifically, defendant's requirement that he produce documentation of a religious requirement.

In *Civil Liberties for Urban Believers v. City of Chicago*, 342 F.3d 752, 760-61 (7th Cir. 2003), we stated that "in the context of RLUIPA's broad definition of religious exercise, a . . . regulation that imposes a substantial burden on religious exercise is one that necessarily bears direct, primary, and fundamental responsibility for rendering religious exercise . . . effectively impracticable." In *Koger v. Bryan*, 523 F.3d 789 (7th Cir. 2008), we quoted language from the Supreme Court's decision in *Thomas v. Review Bd.*, 450 U.S. 707 (1981) to explain the substantial burden test, noting that *Thomas* teaches that government conduct is substantially burdensome "when it 'put[s] substantial pressure on an adherent to modify his behavior and violate his beliefs.' " *Koger*, 523 F.3d at 799 (quoting *Thomas*, 450 U.S. at 718)).[5]

*Koger* is similar to the instant case. In *Koger*, we held that it was a violation of the First Amendment and RLUIPA for prison officials to deny an inmate's request for a non-meat diet on the ground that his religion does not require such a dietary restriction.[6] *Id.* at 797-800. In that case, the plaintiff prisoner, Koger, belonged to a

---

[5] Other courts of appeals have likewise applied the *Thomas* standard in the context of RLUIPA. *See e.g.*, *Shakur v. Schriro*, 514 F.3d 878, 888 (9th Cir. 2008); *Washington v. Klem*, 497 F.3d 272, 277-281 (3d Cir. 2007) (combining *Sherbert* and *Thomas* tests); *Lovelace v. Lee*, 472 F.3d 174, 187 (4th Cir. 2006) (same).

[6] The plaintiff in *Koger* apparently did not bring a state claim under IRFRA. *See Koger*, 523 F.3d at 793.

religion known as Ordo Templi Orientis ("OTO"), which had as its central tenet only "Do what though wilt." *Id.* at 789. But Koger nonetheless believed that his practice of OTO required him to observe a vegetarian diet. *Id.* at 797. In support of his request for the non-meat prison diet, Koger submitted paperwork from OTO stating that OTO "had no general dietary restrictions" but that "each individual [follower] may from time to time, include dietary restrictions as part of his or her personal regimen of spiritual discipline." *Id.* The prison nonetheless denied Koger's request. *Id.* at 794.

We held, first, that requiring a prisoner to show that his preferred diet is compelled by his religion was unlawful, as such a requirement was contrary to RLUIPA, which specifically stated that "[t]he term 'religious exercise' includes any exercise of religion, whether or not compelled by, or central to, a system of religious belief."[7] *Koger* held, second, that requiring a religious belief be verified by clergy was a substantial burden because Koger's religion lacked traditional clergy members. *Id*. at 799. Importantly, we opined that even if Koger had belonged to a religion with more traditional clergy, "a clergy verification requirement forms an attenuated facet of any religious accommodation regime because clergy opinion has generally

---

[7] As a side note, "[a]lthough RLUIPA bars inquiry into whether a particular belief or practice is central to a prisoner's religion, . . . [it] does not preclude inquiry into the sincerity of a prisoner's professed religiosity." *Koger*, 523 F.3d at 797 (citing *Cutter v. Wilkinson*, 544 U.S. 709, 725 n.13 (2005)). Here, however, Miller does not challenge the sincerity of Nelson's beliefs.

been deemed insufficient to override a prisoner's sincerely held religious beliefs." *Id*. at 799-800 (citing *Ford v. McGinnis*, 352 F.3d 582, 593-94 (2d Cir. 2003) (holding that the role the Eid ul Fitr feast played in a prisoner's practice of Islam was determinative of whether there had been a substantial burden, and not the testimony of Muslim clerics as to the proper celebration of the feast); *Jackson v. Mann*, 196 F.3d 316, 320-21 (2d Cir. 1999) (holding that it was the sincerity of a prisoner's beliefs, and not the decision of Jewish religious authorities, that determined whether the prisoner was an adherent of Judaism entitled to a kosher meal); *see also Frazee v. Ill. Dep't of Employment Sec.*, 489 U.S. 829, 834 (1989) (holding that in the context of a denial of unemployment benefits, the plaintiff's refusal, based on his Christianity, to work on Sundays was entitled to protection even though "there are assorted Christian denominations that do not profess to be compelled by their religion to refuse Sunday work")).

*Koger* is essentially dispositive in this case.[8] Like the prison officials in *Koger*, Miller required Nelson to show that his religion compelled the practice in question and to verify that compelled practice with documentation. As in *Koger*, the first of these requirements was unlawful under RLUIPA and the second imposed a substantial

---

[8] We note that district court did not have the benefit of the *Koger* decision when it disposed of Nelson's claims. *Koger* was decided a few weeks after the district court entered its final judgment order.

burden on Nelson's desired religious practice because it was impossible for him to show that his religion, Catholicism, required him to abstain from meat on all Fridays or avoid the meat of four-legged animals. The Catholic clergy who opined on the matter, Father Fortenberry and Father Roscioli, both opined that although not required, dietary discipline was a permissible and laudatory way for Nelson to engage in penance. Miller's demands that Nelson show a religious requirement and submit documentation to that effect thus made Nelson's desired religious exercise "effectively impracticable." *See Koger*, 523 F.3d at 799; *see also Hunafa v. Murphy*, 907 F.2d 46, 47 (7th Cir. 1990) (recognizing that a prisoner can bring a free exercise claim where he is "put to an improper choice between adequate nutrition and observance of the tenets of his faith").

Because we find that Nelson's practice of his religion was substantially burdened by Tamms's procedural requirements for obtaining a religious diet, we reverse the district court in this regard.

### 2.  Substantial Burden: Denial of Non-Meat Diet

Nelson also argues that he was substantially burdened by the prison's actual denial of the meatless diet. We have held that a prisoner's religious dietary practice is substantially burdened when the prison forces him to choose between his religious practice and adequate nutrition. For example, in *Hunafa v. Murphy*, we held that IDOC's failure to ensure that the preparation of meals kept pork separate from other food substantially

burdened a Muslim prisoner's religious practice because it forced him to "an improper choice between adequate nutrition and the tenets of his faith." 907 F.2d at 47. Other circuit courts have likewise found such a choice to be substantially burdensome. *See Love v. Reed*, 216 F.3d 682, 689-690 (8th Cir. 2000) (finding prison's failure to accommodate prisoner's religious diet substantially burdensome and rejecting prison's suggestion that the prisoner could fast as an alternative to the prison's accommodation of the desired diet); *McElyea v. Babbitt*, 833 F.2d 196, 198 (9th Cir. 1987) ("Inmates . . . have the right to be provided with food sufficient to sustain them in good health that satisfies the dietary laws of their religion.").

Here, the district court ruled that the "only relevant religious tenet at issue [in Nelson's free exercise claim] is abstention [from] eating the flesh of four-legged animals on Friday and during Lent (because of plaintiff's failure to exhaust administrative remedies regarding abstention from all meat)." However, as discussed in the exhaustion analysis above, and indeed, as the district court itself found in both its summary judgment and final judgment order, Nelson exhausted his grievances with regard to his request to avoid the meat of four-legged animals at all times *and* his request to avoid *all meat* on Fridays and during Lent.

The district court thoroughly analyzed whether Nelson's avoidance of the meat of four-legged animals imposed a substantial burden, and we do not find that analysis to be clearly erroneous. *See Trustees of the Chi. Painters & Decorators Pension*, 493 F.3d at 785 (in an

appeal from the district court's judgment following a bench trial, appellate courts review the district court's applications of law to its findings of fact for clear error). Bonnie Sullivan, the Tamms dietician, testified that the regular diet would still be nutritionally adequate if all meat of four-legged animals were skipped, so Nelson was not put to a choice between his religious beliefs and adequate nutrition. *See Hunafa*, 907 F.2d at 47.

But looking to the other exhausted grievance, we find that Miller's denial of a non-meat diet on Fridays and during Lent substantially burdened Nelson's practice of religion. With regard to skipping *all* meat, Sullivan testified that "there probably was insufficient nutrition in the regular diet if all meat were skipped." Moreover, Nelson provided undisputed testimony that during Lent in 2002, when he abstained from all meat, he lost so much weight that he had to be hospitalized. Nelson also testified that during Lent he "felt hungry," his bones began to protrude, he was cold, and he was depressed and anxious. Because the undisputed evidence shows, at the very least, that Nelson would be required to forego adequate nutrition on Fridays and for the forty days of Lent in order to comply with his sincerely held religious beliefs, we hold that Miller's refusal to grant Nelson a non-meat diet for those periods imposed a substantial burden on his religious exercise. *See, e.g.*, *Love*, 216 F.3d at 689-90 (refusing to accommodate prisoner's desired religious diet and consequently forcing prisoner to fast one day each week was a substantial burden on prisoner's free exercise of religion).

### 3. Least Restrictive Means and Compelling Government Interest

Because the district court found no substantial burden on Nelson's religious exercise, it did not analyze whether defendant's procedures and conduct were "in furtherance of a compelling government interest" and "the least restrictive means of furthering that compelling government interest" under Section 1983, RLUIPA and IRFRA. *See Thomas*, 450 U.S. at 718; 42 U.S.C. 2000cc-1(a)(1) & (2); *see also Koger*, 523 F.3d at 800 (first considering whether prisoner had established a substantial burden and then analyzing whether prison officials had shown that their requirements were the least restrictive means of furthering a compelling governmental interest); 775 ILCS 35/15. Neither party has briefed this matter on appeal. Thus, we remand this issue to the district court for further consideration in light of this opinion.

## C. Establishment of Religion

Nelson argues that Miller impermissibly favored Muslim and African Hebrew Israelite prisoners by approving vegan diets for those prisoners without obtaining written verification that such diets were required by their religions. In support of his argument of favoritism, Nelson also notes that Muslims received special food on Islamic feast days but Catholic holidays (aside from Christmas) went unobserved. The district court found that Nelson had not proven a violation of the establishment clause because there were valid neutral reasons for Miller's actions in this regard.

The First Amendment states that "Congress shall make no law respecting an establishment of religion . . . ." *Lemon v. Kurtzman*, 403 U.S. 602, 612-13 (1971) teaches that a government policy or practice violates the Establishment Clause if (1) it has no secular purpose, (2) its primary effect advances or inhibits religion, or (3) it fosters an excessive entanglement with religion. The Establishment Clause also prohibits the government from favoring one religion over another without a legitimate secular reason. *See Linnemeir v. Bd. of Trustees of Purdue Univ.*, 260 F.3d 757, 759 (7th Cir. 2001); *Metzl v. Leininger*, 57 F.3d 618, 621 (7th Cir. 1995) ("The First Amendment does not allow a state to make it easier for adherents of one faith to practice their religion than for adherents of another faith to practice their religion, unless there is a secular justification for the difference in treatment.").

Here, the district court found that Miller had a neutral reason for requiring Nelson to explain and document why he wanted a religious/vegan diet while not requiring this of others. Tamms regulations provided that prisoners could abstain from "any foods the consumption of which violates their required religious tenets" and the district court concluded that Miller had required documentation because he was unfamiliar with any Catholic "required religious tenet" which necessitated a non-meat diet. Under the district court's reasoning, Miller did not ask Muslim and African Hebrew Israelite prisoners to submit verification because he understood from his experience that a limited diet was part of many of these prisoners' religious practice.

We find the district court's reasoning persuasive. While, as discussed above, Miller's demand that Nelson submit documentation of a religious requirement was an inappropriate imposition on Nelson's free exercise, Miller's intent to ensure that any putative dietary accommodation adhered to Tamms's regulations regarding religious diets was a secular purpose. There was no evidence connecting Miller's supposed favoritism to Muslims and Black Israelites with a desire to advance those religions or inhibit Catholicism, nor was there evidence that Miller's alleged favoritism actually had that effect.

However, we do note that Miller's May 2, 2002 letter, in which Miller cited several Bible passages purportedly contradicting Nelson's beliefs regarding penance, improperly entangled him in matters of religious interpretation. It simply is not appropriate for a prison official to argue with a prisoner regarding the objective truth of a prisoner's religious belief. But while Miller's correspondence was inappropriate, the Supreme Court has recognized that "[e]ntanglement is a question of kind and degree." *Lynch v. Donnelly*, 465 U.S. 668, 684 (1984); *Agostini v. Felton*, 521 U.S. 203, 233 (1997) (noting that "[n]ot all entanglements . . . have the effect of advancing or inhibiting religion" and stating that the Court "[has] always tolerated some level of involvement between" the state and religion). Rather, "[e]ntanglement must be 'excessive' before it runs afoul of the Establishment Clause." *Id.* Miller's one-time correspondence appears to have had little effect on Nelson, and did not advance or inhibit Catholicism generally. It cannot be said to have fostered "excessive entanglement." We therefore affirm the judg-

ment of the district court with regard to Nelson's estab-
lishment claim.

## D. Remedies

Since Nelson has shown that Miller substantially bur-
dened his free exercise of religion, we move to the
question of remedies. Nelson seeks declaratory and
injunctive relief as well as damages against Miller in his
official and individual capacities under Section 1983,
RLUIPA, and IRFRA. As the analysis below explains,
the only remedies available to him are declaratory relief
and damages against Miller in his individual capacity
under Section 1983 and, possibly, IRFRA.

### 1. Injunctive Relief

The district court found that Nelson's request for injunc-
tive relief was moot because he was receiving a non-meat
diet, but that Nelson's request for declaratory judgment
would survive as a predicate for an award of damages.
Plaintiff contends that his request for injunctive relief
is not moot because his religious diet could be revoked
at any time.

It is well established that a defendant's voluntary
cessation of a challenged practice does not necessarily
moot a case. *See Friends of the Earth, Inc. v. Laidlaw Environ-
mental Services, Inc.*, 528 U.S. 167, 189 (2000); *Vincent v. City
Colleges of Chicago*, 485 F.3d 919, 925 (7th Cir. 2007) ("Vol-
untary cessation of unlawful activity does not moot

every request for prospective relief . . . .") (citing *United States v. W.T. Grant Co.*, 345 U.S. 629 (1953) and *United States v. Raymond*, 228 F.3d 804, 813-15 (7th Cir. 2000)). Rather, "the court must decide whether the complained-of conduct may be resumed." *Id.*, 485 F.3d at 925.

Here, Miller approved a non-meat diet "[b]ased on the seriousness of [plaintiff's] religion" but testified that he did so only because the Tamms warden had directed him to do so. Miller stated that if he were allowed to make the decision, he would still deny Nelson's request because he does not believe a special diet to be a "require-ment" of Nelson's religion. Nonetheless, it is undisputed that Nelson currently receives a non-meat diet and there is no evidence in the record that the diet will be revoked.

A court's power to grant injunctive relief only survives if such relief is actually needed. "The necessary determina-tion is that there exists some cognizable danger of recur-rent violation, something more than the mere possibility." *W.T. Grant Co.*, 345 U.S. at 633; *Milwaukee Police Ass'n v. Jones*, 192 F.3d 742, 748 (7th Cir. 1999). As stated, Nelson currently receives a non-meat diet and there is no evidence that Tamms intends to revoke Nelson's religious diet. Indeed, the cost of further litigation of this matter to the state would seem to be a significant deter-rent to such action. Moreover, as this opinion makes clear, Miller's belief that a religious diet must be based on a religious "requirement" is erroneous. Going forward, Miller is on notice that he cannot lawfully base a denial on the lack of such a requirement, so revocation of the diet, again, appears particularly unlikely.

While it is of course theoretically possible that the warden will reverse his decision and Miller will revoke Nelson's non-meat diet on some other basis, that possibility is supported only by speculation and not evidence. *See In re Associated Press*, 162 F.3d 503, 511 (7th Cir. 1998) (requiring a "reasonable expectation that the same complaining party would be subjected to the same action again") (quoting *Weinstein v. Bradford*, 423 U.S. 147, 149 (1975)); *Sossamon Lone Star State of Texas*, 560 F.3d 316, 325 (5th Cir. 2009) (stating, in an inquiry regarding mootness of injunctive relief in an RLUIPA case, that the court "will not require some physical or logical impossibility that the challenged policy will be reenacted absent some evidence that the voluntary cessation is a sham for continuing possibly unlawful conduct"). We therefore affirm the district court's finding that Nelson's claim for injunctive relief is moot.

Declaratory relief survives as a predicate for damages, and we therefore proceed to the other remedies issues. *See Crue v. Aiken*, 370 F.3d 668, 677 (7th Cir. 2004) ("When a claim for injunctive relief is barred but a claim for damages remains, a declaratory judgment as a predicate to a damages award can survive").

### 2. Official Capacity Claims: Sovereign Immunity Under Section 1983, RLUIPA, and IRFRA

Defendant argues that Nelson's claim for damages against him in his official capacity are barred under Section 1983 (a point conceded by Nelson), RLUIPA and IRFRA. In its summary judgment order, the district court held

that the Eleventh Amendment barred claims for damages against Miller in his official capacity under RLUIPA but held that IRFRA allows damages against the State. Plaintiff argues that he should be able to obtain official capacity damages against Nelson under both RLUIPA and IRFRA.

### a. RLUIPA

For purposes of sovereign immunity, "a suit against a state official in his or her official capacity is . . . no different than a suit against the State itself." *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989). A suit against a state may be brought in federal court only when (1) a state official is sued for prospective equitable relief under *Ex Parte Young*, 209 U.S. 123, 159-60 (1908); (2) Congress abrogates the State's immunity pursuant to its powers under section 5 of the Fourteenth Amendment; or (3) the State consents and waives its immunity. *See, e.g., Gary A v. New Trier High School*, 796 F.2d 940 (7th Cir. 1986). The first two avenues are inapplicable here, because *Ex parte Young* does not apply to claims for damages, *see Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 101-03 (1984), and because Congress enacted RLUIPA under its Article I powers, not the Fourteenth Amendment, *see Bd. of Trustees of the Univ. of Alabama v. Garrett*, 531 U.S. 356, 364 (2001); *Cherry v. Univ. of Wis. Sys. Bd. of Regents*, 265 F.3d 541, 554 (7th Cir. 2001) ("Congress cannot override the States' immunity using an Article I power . . . ."). However, Plaintiff claims that the third avenue applies because the State has waived its immunity and consented to suit.

Section 3 of RLUIPA states that no government may impose a substantial burden on prisoners' religious exercise "in a program or activity that receives Federal financial assistance," 42 U.S.C. § 2000cc-1(b)(1), or in a way that affects interstate commerce, *id.* § 2000cc-1(b)(2). Regarding remedies, the statute provides that prisoners "may assert a violation of [RLUIPA] . . . and obtain *appropriate relief* against a government." *Id.* § 2000cc-2(a) (emphasis added). The question here is whether the term "appropriate relief" is sufficiently specific to waive a state's sovereign immunity to a suit for damages.

In analyzing whether a sovereign has waived its immunity, we strictly construe the scope of any alleged waiver in favor of the sovereign. *Lane v. Pena*, 518 U.S. 187, 192 (1996). We may "not enlarge the waiver beyond what the language [of the statute] requires." *Library of Congress v. Shaw*, 478 U.S. 310, 318 (1986) (internal citations and quotation marks omitted). Consent to suit cannot be implied, *see id.*, and ambiguities are construed in favor of immunity, *see United States v. Nordic Village*, 503 U.S. 30, 34 (1992).

There is a division of authority regarding whether states have waived their sovereign immunity to a suit for damages under RLUIPA. In *Benning v. Georgia*, the Eleventh Circuit held that RLUIPA's reference to "appropriate relief" was specific enough to constitute a waiver. 391 F.3d 1299, 1305-06 (11th Cir. 2004). *Benning* held that RLUIPA's reference to "appropriate relief against government" "unambiguously required states to waive their sovereign immunity from suits filed by prisoners" under

the statute. *Id.* at 1305. A few years later, in *Smith v. Allen*, 502 F.3d 1255 (11th Cir. 2007), the Eleventh Circuit retreated a bit from *Benning*'s analysis, this time reasoning that because Congress had not clearly stated what remedies were included in "appropriate relief," the court should presume that such relief included money damages. *Id.* at 1270-71.

The Fourth and Fifth Circuits have taken a contrary view. In *Madison v. Virginia*, 474 F.3d 118, 130-33 (4th Cir. 2006), the Fourth Circuit reasoned that the phrase "appropriate relief" is subject to multiple interpretations, and while it was willing to infer that states understood this phrase to include injunctive relief, the phrase fell short of "the unequivocal textual expression necessary to waive State immunity from suits for damages." *Id*. at 132. The court noted that the statute makes no reference to monetary relief or sovereign immunity, and that if Congress had wished to obtain a waiver for damages from states as a consequence of accepting funds, it easily could have expressed that intention. *Id*. (citing the Civil Rights Act of 1991, 42 U.S.C. § 1981a(a)(2) (2000)). By using the "open-ended" term "appropriate relief," RLUIPA "foreclose[d] any argument that the statute waive[d] immunity for monetary relief." *Id*. (citation omitted); *see also Webman v. Federal Bureau of Prisons*, 441 F.3d 1022, 1026 (D.C. Cir. 2006) (holding that the federal Religious Freedom Restoration Act's identical "appropriate relief" provision insufficient to waive federal sovereign immunity for damages suits). In *Sossamon v. The Lone Star State of Texas*, the Fifth Circuit likewise found sovereign immunity to bar a suit against state officials in

their official capacities under RLUIPA. 560 F.3d at 331. The court noted that the ordinary rule when interpreting a statute—that a court presumes a statute affords all ordinary remedies not expressly disclaimed—does not apply when inquiring whether a state waived its immunity. *Id.* Rather, damages must be "expressly provided" in the statute in order for a court to find that a state has waived immunity to such suits. *Id.*; *see also Scott v. Beard*, 252 Fed. Appx. 491, 492-93 (3d Cir. 2007) (holding without discussion that the Eleventh Amendment barred official capacity damages under RLUIPA).

We find the Fourth and Fifth Circuits' analysis convincing. The term "appropriate relief" is open to several interpretations and does not provide the "unequivocal textual expression" necessary to effect a sovereign's waiver to suits for damages. Nelson tries to distinguish *Madison* by noting that it relied on the Supreme Court's decision in *Lane*, which dealt with federal, not state, immunity from suit. But plaintiff does not explain why this distinction matters to the underlying analysis. Indeed, the Supreme Court has explicitly stated that "[i]n considering whether the Eleventh Amendment applies . . . cases involving the sovereign immunity of the Federal Government . . . provide guidance." *California v. Deep Sea Research, Inc.*, 523 U.S. 491, 506 (1998).

Because a statutory reference to "appropriate relief" does not provide the "unequivocal textual expression" necessary to effect a waiver of sovereign immunity to suits for damages, we affirm the district court's judgment that Miller is shielded from a monetary judgment in his official capacity under RLUIPA.

### b. IRFRA

Miller concedes that IRFRA allows for monetary damages against him in his official capacity, but contends that the federal courts do not have jurisdiction over such a suit because the Illinois Court of Claims possesses exclusive jurisdiction of all claims against the state itself that are founded on state law. The district court did not address this argument at length, finding only that "IRFRA leaves open the possibility of monetary damages."

Our case law acknowledges that the Illinois Court of Claims "possesses exclusive jurisdiction of all claims against the state itself." *Nelson v. Murphy*, 44 F.3d 497, 505 (7th Cir. 1995) (citing 705 ILCS 505/8). We have also recognized that Illinois courts treat suits against a public employee in his official capacity as suits against the state. *Id*. (Suits against employees in their personal capacity, by contrast, are not considered suits against the state. *Id.*) Thus, it appears that the Illinois Court of Claims has exclusive jurisdiction over the suit against Miller for damages in his official capacity.

Plaintiff's only response to this conclusion is his argument that the Court of Claims cannot provide the "judicial relief" contemplated by IRFRA[9] because it is not part of

---

[9] IRFRA states the following with regard to judicial remedies under the statute:

> Judicial relief. If a person's exercise of religion has been burdened in violation of this Act, that person may assert
>
> (continued...)

the Illinois judiciary but rather is an agency created by the legislature. To support his argument, Nelson quotes the Illinois Court of Claims Act, which states that "any person who files a claim in the court shall, before seeking final determination of his or her claim exhaust all other remedies and sources of recovery whether administrative or judicial; . . ." 705 ILCS 505/25. Plaintiff claims that this portion of the Act distinguishes the Court of Claims from the "judiciary" because it requires a claimant to exhaust all "judicial" remedies before filing in the Court of Claims. But this argument is a non-starter: requiring exhaustion of other judicial remedies does not mean Court of Claims proceedings are "non-judicial" any more than requiring exhaustion of other administrative remedies means that such proceedings are "non-administrative." Because it appears that the Court of Claims possesses exclusive jurisdiction over a suit against Miller in his official capacity, and because Nelson has offered no compelling counter-arguments, we remand this portion of Nelson's suit to the district court for dismissal.

---

[9] (...continued)
   that violation as a claim or defense in a judicial proceeding and may obtain appropriate relief against a government.

775 ILCS 35/20.

### 3. Individual Capacity Claims: RLUIPA[10]

Miller argues that Nelson may not pursue his RLUIPA claim against Miller in his individual capacity because RLUIPA was passed pursuant to Congress's Spending Clause power and cannot subject a state official to liability in his personal capacity. Nelson argues that the terms of RLUIPA clearly evidence Congress's intent to create a cause of action against individuals and that the Spending Clause allows for such suits.

As an initial matter, we find analysis of RLUIPA under the Spending Clause to be appropriate in this case. All circuits to consider whether RLUIPA is a valid Spending Clause enactment have concluded that it is constitutional under at least that power. *See Smith*, 502 F.3d at 1274 n.9 (analyzing RLUIPA under the Spending Clause and finding analysis under the Commerce Clause inappropriate in that case); *Sossamon*, 560 F.3d at 328 n.34 (same); *Madison*, 474 F.3d at 124 (approving of enactment under the Spending Clause, but not passing on a Commerce Clause authority); *Cutter v. Wilkinson*, 423 F.3d 579, 584-90 (6th Cir. 2005) (same); *Benning*, 391 F.3d at 1313 (same); *Charles v. Verhagen*, 348 F.3d 601, 606-11 (7th Cir. 2003) (same); *Mayweathers v. Newland*, 314 F.3d 1062, 1066-70 (9th Cir.

---

[10] Defendant does not contest that Plaintiff may be entitled to damages against him in his personal capacity under Section 1983. The parties have not addressed whether Nelson may pursue a claim against Nelson in his individual capacity under IRFRA in federal court. This will be an appropriate issue for the district court to resolve upon remand.

2002) (same)). Like the Eleventh and Fifth Circuits, we find analysis of RLUIPA under the Spending Clause to be appropriate in this case. Although RLUIPA ostensibly includes Commerce Clause underpinnings as well, *see* 42 U.S.C. § 2000cc-1(b), there is no evidence in this case that Miller's denial of a religious diet "affect[ed] . . . commerce with foreign nations, among the several States, or with Indian tribes." *Id.* Thus, it strikes us as appropriate, at least in this case, to interpret RLUIPA as an exercise of Congress's power under the Spending Clause. *See Smith*, 502 F.3d at 1274 n.9 (reasoning that RLUIPA should be analyzed as an exercise of Congress's Spending Clause authority when there is no evidence of an effect on inter-state or international commerce); *Sossamon*, 560 F.3d at 328 n.34 (same).

We now turn to the more specific issue: whether RLUIPA could properly subject state officials to suit in their individual capacities. RLUIPA authorizes relief against "governments." RLUIPA defines "government" as:

> (i) a State, country, municipality, [etc.] . . .
>
> (ii) any branch, department, agency, instrumentality, or official of an entity listed in clause (i); and
>
> (iii) any other person acting under color of State law.

42 U.S.C. § 2000cc-5(4)(a). As Miller concedes, this lan-guage appears to authorize suit against him in his in-dividual capacity because the third prong allows for suits against "person[s] acting under color of State law" even apart from those persons as "official[s]" as described in the second prong. Indeed, this court found in *Mack v.*

*O'Leary* that identical language in the federal RFRA entitled a prisoner to sue prison officials in their individual capacities. 80 F.3d 1175, 1177 (7th Cir. 1996), *vacated on other grounds by O'Leary v. Mack*, 522 U.S. 801 (1997). But even if the language of the statute contemplates individual capacity liability, we still must address the question of whether a statute enacted pursuant to the Spending Clause should be interpreted as imposing individual liability on persons who do not, themselves, receive federal funds.

The Spending Clause of the Constitution provides, in pertinent part, that "Congress shall have the Power To lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common Defence and general Welfare of the United States." U.S. CONST. art I., § 8, cl. 1. Pursuant to this authority, the Supreme Court has held that "Congress may attach conditions on the receipt of federal funds" and may "further its broad policy objectives by conditioning receipt of federal moneys upon compliance by the recipient with federal statutory and administrative directives*." South Dakota v. Dole*, 483 U.S. 203, 206 (1987) (citation and quotations omitted). Congress's Spending legislation typically grants federal funds to state institutions in exchange for the state's compliance with certain conditions. Such legislation has been described as creating a "contract" between the federal government and the state that receives the federal funds. *See, e.g.*, *Pennhurst*, 451 U.S. at 17; *Floyd v. Waiters*, 133 F.3d 786, 789 (11th Cir. 1998) (citation omitted), *vacated on other grounds*, 525 U.S. 802, *reinstated at* 171 F.3d 1264

(11th Cir. 1999). As a result, "[t]he legitimacy of Congress' power to legislate under the spending power [] rests on whether the State voluntarily and knowingly accept[ed] the terms of the 'contract.'" *Pennhurst*, 451 U.S. at 17.

The two circuit court decisions that have addressed this constitutional issue with regard to RLUIPA, *Smith* and *Sossamon*, both found that state officials could not be held liable in their individual capacities under the statute.[11] In *Smith*, the Eleventh Circuit began by analogizing cases in which plaintiffs sought damages under Title IX, which was also enacted pursuant to Congress's Spending Clause power. The Eleventh Circuit had previously held that Title IX did not allow a private cause of action against a defendant in his individual capacity because individual defendants were not the "recipients" of the federal funds and thus were not parties to the "contract" created by state acceptance of the funds. *Id.* at 1273-74 (citing *Floyd*, 133 F.3d at 789 ("Because the contracting party is the grant-receiving local school district, a Title IX claim can only

---

[11] The Ninth Circuit appears to have assumed that RLUIPA allows for individual capacity suits because it affirmed a district court's grant of qualified immunity to a defendant official under the statute. *Campbell v. Alameida*, 295 F. App'x 130, 131 (9th Cir. 2008). The great number of district courts that have considered this question have been split, but few have considered the constitutional issue, instead focusing merely on the language of the statute. *See, e.g., Agrawal v. Briley*, No. 02-C-6807, 2006 WL 3523750 (N.D. Ill. Dec. 6, 2006) (summarizing split of authority but not discussing constitutional issue).

be brought against the grant-recipient . . . and not an individual")). Based on this analogy, the Eleventh Circuit concluded that "a construction of RLUIPA providing for individual liability raises substantial constitutional concerns" and consequently held that "a provision that derives from Congress' Spending Power cannot be construed as creating a private action against individual defendants for monetary damages." *Id*. at 1275 (citing *Floyd*, 133 F.3d at 789).[12]

The *Sossamon* court agreed with *Smith*. It first noted that the Fifth Circuit had already adopted the rule that Spending Clause legislation can only generate liability for funding grant recipients. *Sossamon*, 560 F.3d at 328, 328 n.35 (citing *Pederson v. LSU*, 213 F.3d 858, 876 (5th Cir. 2000) and *Rosa H. v. San Elizario Indep. Sch. Dist.*, 106 F.3d 648, 654 (5th Cir. 1997)). It also believed that an interpretation of RLUIPA that disallowed individual capacity suits avoided the federalism and accountability

---

[12] Our own circuit has also held in the Title IX context that "only a grant recipient" can violate the statute. *See Smith v. Metropolitan Sch. Dist. Perry Township*, 128 F.3d 1014 (7th Cir. 1997). But we came to this conclusion not based on limitations of Congress's Spending Clause power but rather because the terms of Title IX prohibited discrimination "only by a 'program or activity' receiving federal funding." *Id*. at 1018; *see also Jennings v. Univ. of North Carolina*, 444 F.3d 255, 268 n.9 (4th Cir. 2006) ("Title IX was enacted pursuant to Congress' spending power and prohibits discriminatory acts by funding recipients. Because school officials are not funding recipients *under Title IX*, school officials may not be sued in their individual capacities under Title IX.") (emphasis added).

concerns implicated by an alternative interpretation. *Id.* at 328-29. As the court explained:

> [I]f a congressional enactment could provide the basis for an individual's liability based only on the agreement of (but not corresponding enactment of legislation by) a state, then important representation interests protected by federalism would be undermined. After passively acquiescing in the regulation of its citizens under a federal standard to receive needed funding from Congress, a state legislature could point its finger at the federal government for tying needed funds to an undesired liability—the regulation or law responsible for such liability not having been enacted by the state. Congress could reciprocate by pointing its finger at the state legislature for accepting the funds and visiting liability on its citizens by the state's own choice, even though the state itself did not enact the law or regulation in question. Such an approach blurs the lines of decisional responsibility; that, in turn, undermines the popular check on both state and federal legislatures.

*Id.* at 329 (footnotes omitted). The Fifth Circuit thus held that "Congressional enactments pursuant to the Spending Clause do not themselves impose *direct* liability on a non-party to the contract between the state and the federal government." *Id.* (emphasis in original); *see also, e.g., Moxley v. Town of Walkersville*, 601 F. Supp. 2d 648, 660 (D. Md. 2009) (agreeing with the rationale in *Smith*, and holding that a personal capacity suit

may is not available against an individual defendant under RLUIPA); *Pugh v. Goord*, 571 F. Supp. 2d 477, 507 (S.D.N.Y 2008) (finding the reasoning in *Smith* to be convincing, and concluding that RLUIPA does not provide for money damages against defendants in their individual capacities); *Boles v. Neet*, 402 F. Supp. 2d 1237, 1240 (D. Colo. 2005) ("The Court understands [RLUIPA] to permit cases against a governmental entity, but not against an individual officer, except perhaps in his or her official capacity.").

Despite this weight of authority, Nelson argues that we should nonetheless allow Miller to be held individually liable because, as an employee of the state, Miller was a "third party beneficiary" of the "contract" created between the federal government and Illinois when Illinois accepted RLUIPA funds. Plaintiff contends that "[j]ust as third party beneficiaries to a contract have a right to sue for damages caused by a breach of a contract to which they are not a party, so do citizens have a right to damages when state officials violate the 'contract' implied in spending clause legislation." But we have rejected this argument before. In *Smith v. Metropolitan Sch. Dist. Perry Twp.*, we stated that the fact that a statute "'was enacted pursuant to Congress's spending power is evidence that it prohibits discriminatory acts only by grant recipients.'" 128 F.3d 1014, 1019 (7th Cir. 1997) (holding that Title IX did not allow for damages against school officials in their individual capacities) (quoting *Rowinsky v. Bryan Indep. Sch. Dist.*, 80 F.3d 1006, 1012 (5th Cir. 1996)). Significantly, in *Metropolitan Sch. Dist.*, we quoted approvingly the Fifth Circuit's *Rowinsky* decision,

which stated that " '[w]hile it is plausible that the [federal government's Title IX funding conditions] could encompass ending discriminatory behavior by third parties, the more probable inference is that the condition prohibits certain behavior *by the grant recipients themselves*.' " *Id.* (emphasis added) (quoting *Rowinsky*, 80 F.3d at 1012-13). Moreover, we remain concerned that interpreting RLUIPA to allow for suits against officials in their personal capacities could implicate significant federalism and accountability concerns, as voiced by our colleagues in *Smith* and *Sossamon*. *See Smith*, 502 F.3d at 1275 n.10 (citing *Daker v. Ferrero*, 475 F. Supp. 2d 1325, 1341-42 (N.D. Ga. 2007) ("By imposing liability on non-recipients of federal funding-individuals who are in essence involuntary and unknowing third parties to the funding contract-RLUIPA would become an example of an unprecedented and untested exercise of Congress' [S]pending power.")); *Sossamon*, 560 F.3d at 328-29.

Construing RLUIPA to provide for damages actions against officials in their individual capacities would raise serious questions regarding whether Congress had exceeded its authority under the Spending Clause. Thus, as a matter of statutory interpretation, and to avoid the constitutional concerns that an alternative reading would entail,[13] we decline to read RLUIPA as

---

[13] The "canon of constitutional avoidance is an interpretive tool, counseling that ambiguous statutory language be construed to avoid serious constitutional doubts." *FCC v. Fox TV Stations,*

(continued...)

allowing damages against defendants in their individual capacities.

### III. Conclusion

We REVERSE the district court's judgment that Nelson's free exercise of religion was not substantially burdened by Tamms procedures and its denial of a non-meat diet on Fridays and during Lent. But as our remedies analysis makes clear, Nelson's free exercise claim is still viable against Miller only in his individual capacity under Section 1983 and, possibly, IRFRA. However, before the district court can enter a declaratory judgment or assess damages for Nelson on either of these claims, the district court must determine (1) whether defendant's procedures and conduct were "in furtherance of a compelling government interest" and "the least restrictive means of furthering that compelling government interest"; and (2) whether Miller is entitled to qualified immunity. These issues were not briefed on appeal, so we REMAND them to the district court for further consideration. We AFFIRM the judgment of the district court with regard to Nelson's claim under the Establishment Clause.

With regard to remedies, we AFFIRM the district court's judgment that Nelson's claim for injunctive relief is moot.

---

[13] (...continued)
*Inc.*, ___ U.S. ___, 129 S. Ct. 1800, 1812 (2009) (citing *Edward J. DeBartolo Corp. v. Florida Gulf Coast Building & Constr. Trades Council*, 485 U.S. 568, 575 (1988)).

As to the official capacity claims, we AFFIRM the district court's judgment that sovereign immunity bars any suit against Miller in his official capacity under Section 1983 and RLUIPA. However, we REVERSE the district court's determination that IRFRA allows Illinois prison officials to be sued in their official capacities in federal court. Finally, as to the individual capacity claims, we hold that RLUIPA does not allow for such suits and, as stated, we remand Nelson's individual capacity claims under Section 1983 and IRFRA for further proceedings.