**Marco GARNICA, Plaintiff,**

**v.**

**WASHINGTON DEPARTMENT OF CORRECTIONS, Eldon Vail, Ronald Fraker, Brent Carney, Jay A. Jackson, Jamie Calley, Defendants.**

**Case No. C12–5544 RJB.**

United States District Court,
W.D. Washington,
at Tacoma.

Aug. 13, 2013.

**1254**

Marco Garnica, Connell, WA, pro se.

Candie M. Dibble, Attorney General of Washington, Spokane, WA, for Defendants.

### ORDER ADOPTING REPORT AND RECOMMENDATION AND DISMISSING CASE

ROBERT J. BRYAN, District Judge.

This matter comes before the court on the Report and Recommendation of the magistrate judge. Dkt. 50. The court has reviewed the relevant documents, including plaintiff's objections (Dkt. 53) and the remaining record.

On June 19, 2013, U.S. Magistrate Judge Karen L. Strombom issued a Report and Recommendation, concluding that (1) plaintiff failed to raise a genuine issue of material fact to establish an Eighth Amendment violation, based upon his consumption of the food provided during the 2010 Ramadan fast; and plaintiff failed to raise a genuine issue of material fact to establish that defendants acted with deliberate indifference to his health and safety; (2) defendants cannot be held liable under RLUIPA for monetary damages; and any request for injunctive relief under RLUIPA is moot; (3) plaintiff failed to raise a genuine issue of material fact as to his claim that the Ramadan 2010 policies and meals burdened the practice of his religion; and (4) plaintiff failed to exhaust his claims relating to the 2010 Eid ul-Fitr Feast. Dkt. 50.

On July 1, 2013, plaintiff filed objections to the Report and Recommendation, arguing that (1) his Eighth Amendment rights were violated when defendants denied him enough calories and nutrition during the Ramadan 2010 fast to maintain his health,

requiring him to seek medical attention and to violate one of the tenets of his religion by breaking his fast; (2) the claim under RLUIPA is not moot; and (3) defendants' policies regarding the Ramadan 2010 fast violated his First Amendment rights to practice his religion. Dkt. 53.

On August 6, 2013, defendants filed a response to the objections, arguing that plaintiff failed to show that the 2010 Ramadan box meals were nutritionally deficient or that defendants acted with deliberate indifference; that the RLUIPA claim for injunctive relief is moot; and that plaintiff failed to show that defendants' actions substantially burdened the practice of his religion. Dkt. 54.

The court has carefully reviewed the record. The Report and Recommendation carefully and accurately set forth the facts, thoroughly analyzed the facts in relation to the law, and concluded that plaintiff has not raised a material issue of fact regarding his claims under the First and Eighth Amendments, and his claim under RLUIPA. The record shows that defendants attempted to accommodate the inmates' nutritional requirements during the 2010 Ramadan fast, while addressing the institution's need for cost effectiveness and efficiency, and, when deficiencies were identified, promptly addressed the problems. The court can add nothing more to the well reasoned Report and Recommendation, and concurs with the recommendation. Defendants are entitled to summary judgment. Further, the record shows that plaintiff's claim regarding the 2010 Ramadan Eid ul-Fitr Feast should be dismissed without prejudice because plaintiff failed to exhaust this claim.

This case was originally filed in Thurston County Superior Court, and was removed by defendants to federal court. *See* Dkt. 1. In the event that plaintiff files an appeal of this case, *in forma pauperis*

status should be denied, without prejudice to plaintiff to file an application to proceed *in forma pauperis* with the Ninth Circuit U.S. Court of Appeals.

Accordingly, it is hereby **ORDERED** that the Report and Recommendation (Dkt. 50) is **ADOPTED.** Defendants' motion for summary judgment (Dkt. 39) is **GRANTED.** Plaintiff's claim relating to the 2010 Eid ul-Fitr Feast is **DISMISSED WITHOUT PREJUDICE.** Plaintiff's remaining claims are **DISMISSED WITH PREJUDICE.** In the event that plaintiff files an appeal of this case, *in forma pauperis* status is **DENIED,** without prejudice to plaintiff to file an application to proceed *in forma pauperis* with the Ninth Circuit U.S. Court of Appeals.

The Clerk is directed to send uncertified copies of this Order to all counsel of record and to any party appearing *pro se* at said party's last known address.

**REPORT AND RECOMMENDATION**

KAREN L. STROMBOM, United States Magistrate Judge.

Before the Court is the Motion for Summary Judgment of Defendants Eldon Vail, Ronald Fraker, Brent Carney, Jay Jackson, Jamie Calley, and the Washington Department of Corrections (DOC). ECF No. 39. Defendants served Plaintiff with a *Pro Se* Prisoner Dispositive Motion Notice consistent with *Woods v. Carey,* 684 F.3d 934, 935, 940–41 (9th Cir.2012) and in accordance with the holding of *Rand v. Rowland,* 154 F.3d 952, 962–63 (9th Cir.1998). ECF No. 40. The Court granted Plaintiff Marco Garnica's motion for extension of time and re-noted the motion for June 7, 2013. ECF No. 43. Plaintiff filed a brief and declaration in response to the motion. ECF Nos. 48 and 49.

Mr. Garnica, a pro se prisoner currently incarcerated at the Coyote Ridge Cor-

rection Center (CRCC), alleged in his complaint that in 2010, when he was incarcerated at the Clallam Bay Corrections Center (CBCC), Defendants implemented Ramadan food service policies that violated his rights under the First Amendment (Freedom of Religion), Eighth Amendment (cruel and unusual punishment), Fourteenth Amendment (due process and equal protection), and the Religious Land Use and Institutionalized Persons Act, 42 U.S.C. § 2000cc ("RLUIPA"). ECF No. 1–1, pp. 41–46.[1] Having reviewed the motion, supporting declarations, and balance of the record, the Court recommends that Defendants' motion for summary judgment (ECF No. 39) be granted.

## FACTS

Marco Garnica became a Muslim during his incarceration at CBCC in 2008. He is a believer in the Qur'an and the Sunnah of the Prophet Muhammad. ECF No. 49, Declaration of Marco Garnica, ¶¶ 2, 3. At the time of the 2010 Ramadan Fast, he was a vegetarian on the Mainline Alternative Diet (MAD). *Id.*, ¶ 4. Attached to his declaration is Mr. Garnica's religious diet request dated May 4, 2010, where he requests to be placed on MAD. *Id.*, p. 71. Mr. Garnica states that it is a mandatory obligation of his religion that he fast for thirty days during the Islamic month of Ramadan. Mr. Garnica first participated in the Ramadan fast in 2009 when he was confined in the Intensive Management Unit (IMU) of CBCC. He received breakfast, lunch, and a hot meal, and states that he did not experience any ill effects during that fast. *Id.*, ¶ 5.

Prior to 2010, Mr. Garnica and other Muslims were allowed to report to the dining hall in the evening for prayer, reading the Qur'an, and eating their hot dinner meals. He states that their meals were the same as those served to non-fasting inmates which had been kept for them in hot carts for warmth. After the dinner meal, the fasting inmates picked up two sacks with their breakfast and lunch meals, which they were allowed to take back to their units to consume before sunrise the next day. According to Mr. Garnica, the meals provided during the 2009 Ramadan fast consisted of approximately 2,800 calories and contained adequate nutritional value. ECF No. 49, Garnica Decl., ¶ 6. At the end of Ramadan 2009, all participating Muslims were allowed to purchase food enhancements to celebrate the obligatory Eid–Ul–Fitr feast using funds donated by the Islamic community account and others. *Id.*

Jay Jackson is Food Service Program Manager for the DOC. According to Mr. Jackson, prior to 2010, Ramadan meals consisted of a dinner hot meal and sack meals equaling breakfast and lunch calories. ECF No. 39–1, Exhibit 1, Declaration of Jay Jackson, ¶¶ 1, 3. The Ramadan dinner hot meal would typically be served after mainline (the standard meals served to the general offender population at a correctional facility). Serving the Ramadan hot dinner meal so that Ramadan participants received their meals after sunset incurred additional food service and custody staff time. *Id.*, ¶ 3. Some facilities would store the warm portion of the meal in a heated unit to maintain temperature, while other facilities provided an extra mainline, thereby occurring additional staff costs, including overtime. *Id.*, ¶ 4. Mr. Jackson states that there is no nutritional

---

**1.** Similar claims filed by other inmates relating to the 2010 Ramadan meals have been dismissed. *Daniel C. Carter v. DOC, et al.,* C11–5626 RJB/KLS; *Tony Smith v. DOC, et al,* C11–5731 BHS/JRC; *Harry J. Whitman v. DOC, et al.,* C11–5457BHS/KLS; *Garnica v. DOC, et al,* C11–5806 RBL/KLS

difference between a cold meal and a hot meal. *Id.*, ¶ 5 n. 2.

Brent Carney is the Dietary Services Manager of DOC. He is a certified dietitian in the state of Washington and obtained registered dietitian credentials from the Academy of Nutrition and Dietetics. ECF No. 39–2, Exhibit 2, Declaration of Brent Carney, ¶ 1. Mr. Carney states that in 2009, DOC looked into providing Ramadan box meals for offenders who would be celebrating Ramadan in 2010 (which would occur August 11, 2010 through September 9, 2010). *Id.*, ¶ 6. According to Mr. Carney, providing a Ramadan box meal that contained food items for a full set of meals eliminated any need for additional food service staffing and meal preparation outside of normal working hours, additional meal deliveries to segregation units, additional custody staff, and other additional operational overhead. Overall, box meals would reduce costs and minimize the disruption to kitchen staff while allowing offenders to meet their nutritional needs. *Id.*

The use of box meals anticipated the issue of Ramadan moving towards the summer solstice. ECF No. 39–1, Exhibit 1, Jackson Decl., ¶ 6. Every year the beginning of Ramadan moves forward roughly ten days. This creates an ever-increasing time period between mainline dinner and when the Ramadan hot meal would be served after sunset. This trend increases the burden on the DOC by extending the time it needs to have personnel available to staff the dining hall after-hours during Ramadan. Additionally this has the potential to interfere with prison operations as many correctional program opportunities occur after mainline. *Id.*

Mr. Jackson states that standardized box meals addressed offenders' complaints that Ramadan meals were different depending on where the offenders were housed. ECF No. 39–1, Exhibit 1, Jackson Decl., ¶ 7. Furthermore, because the box meal was cold, offenders would have greater flexibility on when they could consume their meal. Offenders could pick-up their box meals and take them back to either their cell or chapel to break their fast. Unlike the hot portions of meals that had to be eaten shortly after they were served, the cold meal could be consumed anytime during the evening. *Id.*

On October 28, 2009, Jay Jackson and Brent Carney attended a Food Managers Meeting at the Airway Heights Corrections Center to discuss the plan to introduce Ramadan box meals for 2010. It was planned that at the next meeting the possible food items that were to be included in the Ramadan box meals would be discussed. ECF No. 39–1, Exhibit 1, Jackson Decl., ¶ 8; ECF No. 39–2, Exhibit 2, Carney Decl., ¶ 7.

On March 9, 2010 and March 10, 2010, another meeting was held to discuss the proposed food items that would be included in the Ramadan box meals. It was decided that two different boxes would be offered every other day. The boxes would contain such items as cereal and powdered milk, fresh or dried fruit, breakfast coffee cake item, peanut butter and bread, Halal lunch meat with cheese, bread, condiments, dried dates to break the fast, and two fortified fruit drinks. ECF No. 39–1, Exhibit 1, Jackson Decl., ¶ 9; ECF No. 39–2, Exhibit 2, Carney Decl., ¶ 8. The food items for the box meals were selected using available Halal supplies, items not easily spoiled, and items not needing to be heated when the kitchens are closed and/or held in food warmers beyond the recommended storage guidelines. *See* ECF No. 39–2, Exhibit 2, Carney Decl., ¶ 6.

On March 11, 2010, Defendant Carney sent a rough draft of Ramadan nutritionals to Correctional Industries (CI) for input

and review. ECF No. 39–2, Exhibit 2, Carney Decl., ¶ 9. CI uses the Esha program for nutritional analysis of the foods it produces for the DOC. CI staff enter the nutritional data of CI foods into the Esha software by inputting the food product, recipe, and portion size to get the nutritional values for each item. *Id.*, ¶ 4. DOC also uses software purchased through CI to perform nutritional analysis for menus. DOC staff enters the nutritional data into the CI software. The data entered into the CI software consists of recipes, products, and portion size for menu items. The final product is the nutritional analysis for each menu. *Id.*, ¶ 3. Occasionally, the CI software and Esha programs arrive at different nutritional values for a particular food item. When that occurs Defendant Carney works with CI to analyze the results and determine the final nutritional content for the food item. *Id.*, ¶ 5.

On March 22, 2010, Defendant Carney sent CI the finalized nutritional information for the two proposed Ramadan box meals. On May 22, 2010, Defendant Carney checked nutritionals for the Halal meats and the Kaiser Roll that were to be included in the 2010 Ramadan box meals and noticed that the software he used had overstated the calorie content for the Halal meats and the Kaiser Roll. Defendant Carney corrected the inaccuracy and notified Jay Jackson of the change to the nutritional information. ECF No. 39–2, Exhibit 2, Carney Decl., ¶¶ 10–12.

On May 27, 2010, a memorandum regarding the new Ramadan procedures was posted to all offenders from Ron Fraker, Superintendent of CBCC. The memorandum advised, among other things, that there would be no hot meals provided during Ramadan and that all facilities would

be purchasing their Ramadan meal trays from CI "which have been reviewed and approved to be nutritional." ECF No. 49, Garnica Decl., p. 30.

On July 19, 2010, three weeks before the 2010 Ramadan fast, Inmate Harry Whitman [2] filed an injunctive action in Thurston County Superior Court, Case No. 10–2–01754–0. The action was unsuccessful. Mr. Garnica claims that Defendant Jackson "perjured" himself in the Thurston County case when he falsely declared, *inter alia*, that the Ramadan box meals contained 2,600 calories. ECF No. 49, Garnica Decl., ¶ 19. According to Mr. Jackson, however, the declaration he provided in that case was based on the nutritionals available at the time. It was not until the next day that Mr. Jackson found issues with the actual nutritional content of the Ramadan meals and the deficiencies were corrected and forwarded to food managers on August 10, 2010. *See Whitman v. DOC, et al.*, C11–5457BHS, ECF No. 82 (Declaration of Jay Jackson), p. 2, ¶¶ 4–5.

Thus, it is clear that the August 9, 2010 affidavit that Defendant Jackson submitted to the Thurston County Superior Court was inaccurate. Although Mr. Garnica attempts to depict this inaccuracy as "perjury," he fails to provide any admissible evidence to show that Defendant Jackson knew the information he provided to the Superior Court was incorrect when he provided the information. Further, as discussed below, Mr. Jackson corrected the information one day later on August 10, 2010 when he learned of his error. In addition, prison officials supplemented the box meals to provide additional calories to meet the caloric goals defined in DOC

---

**2.** Mr. Whitman's claims relating to the 2010 Ramadan fast have been dismissed. *Whitman*

*v. DOC, et al.*, Case No. C 11–5457BHS/KLS.

policy. ECF No. 39–1, Exhibit 1, Jackson Decl., ¶ 15 and Attachment C, p. 16.

On August 9, 2010, Defendant Jackson sent an email to Gregory Garringer, Religious Programs Manager, stating that offenders on the mainline alternative (vegetarian) diet who were participating in Ramadan were to receive two green snacks and two blue snacks along with the Ramadan box meal. These additional snacks were designed to make-up any shortfall in calories that might result from the vegetarian offender not eating the meat items in the box meal. Mr. Garringer then forwarded the email to all facility chaplains and chaplain supervisors. ECF No. 39–1, Exhibit 1, Jackson Decl., ¶ 10 and Attachment D (August 9, 2010 Email), p. 18.

On August 10, 2010, the day before the start of Ramadan, a CBCC staff member notified Defendant Jackson that some offenders had raised concerns about the meals, specifically about the amount of calories that were to be provided. ECF No. 39–1, Exhibit 1, Jackson Decl., ¶ 10. The staff member sent copies of the box meal labels to Defendant Jackson. *Id.;* see also *Id.* Attachment A. After he reviewed the box meal labels, Defendant Jackson realized that the calories indicated on the labels did not reflect the original caloric values that had been planned for the Ramadan box meals. *Id.,* ¶ 11.

Defendant Jackson contacted CI to verify that the lower calorie box meals delivered to CBCC were supplied to all facilities and were not just an anomaly. He was told that all facilities received the lower calorie box meals and that CI would re-enter the nutritionals into their system. Additionally, Defendant Jackson discovered the meals' nutritional label misstated the calories because the meals contained more calories than were indicated on the labels. ECF No. 39–1, Exhibit 1, Jackson

Decl., ¶ 12. When CI re-entered the nutritional information, it turned out that the box meals contained additional calories totaling 1920 calories. *Id.; see also id.* Attachment B; ECF No. 39–2, Exhibit 2, Carney Decl., ¶¶ 12–13. Because the calorie total was still short, Defendant Jackson contacted Defendant Carney and they discussed how to supplement meals with additional calories to meet the caloric goals defined in DOC policy. ECF No. 39–1, Exhibit 1, Jackson Decl., ¶ 13; ECF No. 39–2, Exhibit 2, Carney Decl., ¶ 13.

On August 10, 2010, Defendant Jackson sent the following email to all food service managers:

This is important information about Ramadan and needs to be implemented today to ensure nutritional compliance for those participating in Ramadan.

The original Ramadan box nutritional information was incorrect, the actual calories for the Ramadan box is less than 2600 calories and additions will need to be made to make up for these calories.

The list of items contained in the box is correct with the exception of one fortified drink packet is included instead of two and the nutritional information on the Ramadan box is incorrect, both of these items will be corrected on future boxes as they are made for future deliveries. Review future deliveries for updated information.

To account for the calories the following additions must be made:

- Male and female offenders participating in Ramadan should receive one fortified drink until new Ramadan boxes arrive with two packets, at that time discontinue the second packet provided by Foodservice because the second milk will be in the box.

- Male offenders will need to be provided one of the following options each day as an addition to the Ramadan box. These options can be packed in a paper bag.

1. One blue snack and one yellow snack or the equivalent—two peanut butter packets, one jelly packet, two slices bread or another two bread item and four packets of crackers.

2. One piece fruit, two packets of cookies, two slices of bread or equal, one salad dressing, and one mustard.

ECF No. 39–1, Exhibit 1, Jackson Decl., ¶ 15 and Attachment C, p. 16.

With the supplements provided with the tray lunch, the average daily calories provided during Ramadan was 2724 calories. ECF No. 39–1, Exhibit 1, Jackson Decl., ¶ 16. In addition to the tray lunch and supplements, vegetarian offenders also received two green snacks and two blue snacks with each Ramadan box meal. These additional snacks were provided to make up for any calories lost by not eating the meat in the box meals. *Id.,* ¶ 17; ECF No. 39–3, Exhibit 3, Declaration of Jamie Calley, ¶ 7. Green snacks contained 190 calories each and blue snacks contained 310 calories each, providing an additional 1000 calories each day for vegetarian offenders. *Id.*

In response to Defendant Jackson's email of August 10, 2010, CBCC's food service manager Jamie Calley decided to implement the second option outlined in Mr. Jackson's email because the food items were readily available to CBCC. ECF No. 39–3, Exhibit 3, Calley Decl., ¶¶ 5–6. The first Ramadan box meal was handed out at CBCC on August 10, 2010, the day before Ramadan was set to begin. On that day, the offenders observing Ramadan would have received their standard three meals in addition to the Ramadan box meal for August 11, 2010. ECF No. 39–3, Exhibit

3, Calley Decl., ¶ 8. To the best of Defendant Calley's recollection, the supplemental food items were provided at the first Ramadan meal and all box meals contained the full caloric value as set forth by Defendant Jackson and Defendant Carney. Defendant Calley believes that the longest delay in providing the supplemental food items would have been one day and all offenders observing Ramadan would have received their full box meals by August 11, 2010 for consumption on August 12, 2010. *Id.*

On August 11, 2010, Defendant Carney sent Defendant Jackson the nutritional information for the additions to the Ramadan box meals. ECF No. 39–2, Exhibit 2, Carney Decl., ¶ 16. Defendant Carney noticed that the nutritional information for the Halal meat was incorrect and he updated the nutritional information. Thus, the bologna Ramadan box meal with the supplements provided 2698 calories and the salami Ramadan box meal with the supplements contained 2749 calories. *Id.*

During Ramadan 2010, Jamie Calley met with some offenders who stated objections to the box meals because they contained too many carbohydrates and sugars. Ms. Calley states that the offenders were also upset because they were no longer given a hot meal, but were not objecting to the overall caloric content of the box meals. Ms. Calley states that she emailed the offenders' concerns to Brent Carney, who inquired whether the box meals included the correct amount of Halal meat. Ms. Calley states that the amount of Halal meat provided was not an issue for the inmates. ECF No. 39–3, Exhibit 3, Calley Decl., ¶ 9. Ms. Calley states that she responded to Level II grievances filed over the Ramadan box meals, met with offenders in two groups and with a few offenders individually, reviewed pertinent DOC policies and guidelines, and consulted with

DOC staff. She states that it was her understanding that the Ramadan box meal and supplemental food items provided adequate nutrition and calories. ECF No. 39–3, Exhibit 3, Calley Decl., ¶ 10.

In an email dated August 13, 2010, Ms. Calley notified Jay Jackson, Brent Carney, and others, that there "has been a lot of complaining here about the nutritional content of the Ramadan meals. Several offenders who are participating have approached me about the high level of carbs and sugar in the meals." ECF No. 49, p. 66.

On August 11, 2010, the day Ramadan 2010 began, Mr. Garnica filed a grievance. ECF No. 49, p. 68 (Log No. 1016811). Mr. Garnica asked to be provided with two Ramadan box meals each day or one Ramadan box meal and a hot dinner meal each day. Id. On August 12, 2010, he received the following response from Denise Larson:

> Your concerns regarding the calorie content of the Ramadan meal box have been addressed. To ensure nutritional standards are met, supplemental items will be provided. Thank you for bringing this to our attention.

ECF No. 49, p. 68.

On August 18, 2010, Mr. Garnica appealed Grievance No. 1016811 to Level II, stating that the current Ramadan meal is 500 calories less than the suggested 2300 calories, that over 1000 calories consist of cookies, condiments, brownies, cupcakes, and juice packets, and that he was experiencing body ailments and pain. ECF No. 49, p. 69. He received the following response from Ronald Fraker on September 13, 2010:

> Food Manager 4 J. Calley investigated this complaint. During the investigation she reviewed the initial complaint, response and appeal to Level II. She also, reviewed the pertinent policies, staff and

offender notices, and the guidelines and procedures for serving the approved Ramadan box meals and supplemental sacks. She also met with you and consulted with DOC staff.

> All information gathered and received indicates that according to a review by a dietician, the Ramadan box meal and supplemental sack provide adequate nutrition and calories.

> If you have any health concerns, you have the option of signing up for sick all [sic] and/or declaring a medical emergency.

ECF No. 49, p. 69.

On September 21, 2010, Mr. Garnica appealed Grievance No. 1016811 to Level III, claiming physical injury, emotional and mental distress with severe physical pain and grief and requested to be compensated at the rate of $300.00 per day that he was given "food service food." ECF No. 49, p. 76. Mr. Jackson received the Level III grievance after the conclusion of Ramadan. Because the nutritional values were corrected and Ramadan had concluded, he found that the Level I and Level II responses had appropriately addressed Mr. Garnica's complaints. ECF No. 39–1, Exhibit 1, Jackson Decl., ¶ 6

Medical records provided by Mr. Garnica indicate that he was seen on August 17, 2010 by D. Robertson, PA–C, for complaints of stomach pains, lack of energy, nausea, fatigue, and hunger headaches. ECF No. 49, Garnica Decl., ¶ 30; p. 67. Mr. Garnica claims that he then weighed five pounds less than he had at the start of the 2010 Ramadan fast. ECF No. 49, Garnica Decl., ¶ 30. On August 23, 2010, Mr. Garnica was seen by D. Robertson in follow-up for complaints of diarrhea, fatigue, nausea, and stomach cramps. ECF No. 49, p. 70. On September 1, 2010, Mr. Garnica was seen by D. Robertson for a

complaint of a pain in his left side radiating to his leg and testicle, a rash on his neck and shoulder, and abdominal pain. *Id.* On September 19, 2010, Mr. Garnica was seen by D. Robertson for a constant headache. *Id.*

According to Mr. Garnica, he lost 15 pounds during the 2010 Ramadan fast. At the same time, he states that he was medically diagnosed as obese and complains that he was refused a diet to lose weight. ECF No. 49, Garnica Decl., ¶ 44.

Mr. Carney states that the estimated energy or caloric requirement is defined as the amounts of energy that need to be consumed by an individual to sustain a stable body weight in the range desired for good health. The Dietary Reference Intakes for estimated energy requirements for men is based on their age, physical activity level and their body weight. These estimated caloric requirements vary widely. The energy requirement for an average thirty year old male ranges from 1850 calories a day for a lean male with sedentary physical activity level, to 3200 calories a day for a heavier male with an active physical activity level. ECF No. 39–2, Exhibit 2, Carney Decl., ¶ 17.

A mainline meal provides an average of 2830 calories per day to meet DOC's recommended caloric guidelines for males. DOC's guidelines for mainline meals for males are based on a range of between 2700 and 3000 calories per day. ECF No. 39–2, Exhibit 2, Carney Decl., ¶ 18; *see also id.*, Attachments A and 1. The range was set because actual daily calories of meals may vary plus or minus 300 calories per day and because the caloric range was made to meet the need of the diverse male inmate population. *Id.* According to Mr. Carney, the calorie level for Ramadan meals was set at 2700 calories per day to stay within DOC guidelines of 2700 to 3000 calories per day, a range which is well

above USDA Dietary Reference Intake recommendations. *Id.*

Also according to Mr. Carney, the errors that were made in the packaging and calculations of the Ramadan meals resulted in Ramadan Box meals providing approximately 1900 calories per day. The health ramifications of eating 1900 calories per day would result in no more than two pounds weight loss per week or approximately eight pounds of weight loss during the 30 days of Ramadan based on scientific evidence of weight loss. An eight pound weight loss in one month is not considered significant and should not cause adverse health consequences. ECF No. 39–2, Exhibit 2, Carney Decl., ¶ 19. In addition, the lower calorie Ramadan box meals were corrected with supplemental foods on site. *Id.,* ¶ 19.

Mr. Garnica states that on the evening of August 10, 2010, he was provided with the Bologna Fasting Tray and snacks which totaled 2,619 calories. However, because he is a vegetarian, he was not able to eat the powdered milk, oatmeal cookies, kaiser roll, biscuit, salad dress, and butterbrickle muffin. The items he was not able to eat totaled 810 calories, which left him food totaling 1,809 calories. ECF No. 49, Garnica Decl., ¶¶ 20–21. He also claims that when he left the dining hall, unidentified staff members searched the fasting inmates and confiscated their two green and two blue snacks, leaving him with only 929 calories to eat every other day during the thirty day fast. ECF No. 49, ¶ 22.

Mr. Garnica states that on the next day, he was provided with the Salami Fasting Tray and snacks which totaled 2,621 calories. ECF No. 49, Garnica Decl., ¶ 23. However, after subtracting the "meat or animal products" and confiscation of the snacks, he was left with only 397 calories to eat every other day during the thirty day fast. *Id.*

Mr. Garnica alleges that the 2010 Ramadan policy restricted his ability to purchase traditional food items for the Eid ul-Fitr feast. Under the new policy, juice and a pastry or cookie would be provided by the DOC for the event. ECF No. 49, Garnica Decl., ¶¶ 46–47. Mr. Garnica states that the Defendants scheduled the feast for September 18, 2010, seven days after the end of the Ramadan fast, which was beyond the time to have the feast. *Id.*, ¶ 47.

According to the DOC Handbook of Religious Beliefs and Practices, Eid ul-Fitr is a celebration which marks the end of Ramadan. ECF No. 39–5, Exhibit 5, Declaration of Donald Duncan, ¶ 7. Donald Duncan is a chaplain at CBCC who conducts, coordinates, and supervises religious activities. *Id.*, ¶ 1. Eid ul-Fitr consists of an obligatory prayer. In addition, a celebration with or without food may be held. *Id.*, ¶ 7.

In November 2009, the Eid ul-Fitr prayer session was scheduled for September 10, 2010, the first day after Ramadan. The Eid ul-Fitr feast was scheduled for September 14, 2010, which was the first day after Ramadan that facilities would be available. These events were advertised with posters and on the monthly calendars. ECF No. 39–5, Exhibit 5, Duncan Decl., pp. 50–51, ¶¶ 4, 8–11; Attachment A, p. 7. Mr. Garnica signed up for and attended the prayer session on September 10, 2010. *Id.*, ¶¶ 12–13; Attachment C, p. 12.

Chaplain Duncan states that on or about September 10, 2010, he was approached by Brian Powers, the designated Imam or leader of the group, approached him and told him that the Islamic group's annual Eid ul-Fitr feast could not go forward because the group was not ready for the event and that they were going to cancel it even though the event was already scheduled and the guests were approved. *Id.*, ¶ 14. The Eid Ul Fitr Annual Event was rescheduled to November 16, 2010. That day, however, was designated as a modified lock down day which limited the number of staff at the institutions and restricted movement. The event was rescheduled to November 30, 2010, but was then cancelled by the leadership of the Islamic group. *Id.*, ¶ 16. A separate event scheduled on September 21, 2010 for Nation of Islam inmates proceeded as scheduled. *Id.*, ¶ 15.

According to Mr. Jackson, both the box meals provided in 2010 and previous Ramadan meals that included a hot meal tray were nutritionally similar and both within DOC guidelines. However in 2011, DOC, in consultation with community Muslim leaders, decided to provide a hot meal in addition to the cold meal. The combined calorie for both meal items is approximately 2800 calories. ECF No. 39–1, Exhibit 1, Jackson Decl., ¶ 19.

### SUMMARY JUDGMENT STANDARD

The Court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact, and the movant is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(a). The moving party has the initial burden of production to demonstrate the absence of any genuine issue of material fact. Fed. R.Civ.P. 56(a); *see Devereaux v. Abbey,* 263 F.3d 1070, 1076 (9th Cir.2001) (en banc). To carry this burden, the moving party need not introduce any affirmative evidence (such as affidavits or deposition excerpts) but may simply point out the absence of evidence to support the nonmoving party's case. *Fairbank v. Wunderman Cato Johnson,* 212 F.3d 528, 532 (9th Cir.2000). A nonmoving party's failure to comply with local rules in opposing a motion for summary judgment does not relieve the moving party of its affirmative duty to demonstrate entitlement to judg-

ment as a matter of law. *Martinez v. Stanford*, 323 F.3d 1178, 1182–83 (9th Cir. 2003).

"If the moving party shows the absence of a genuine issue of material fact, the non-moving party must go beyond the pleadings and 'set forth specific facts' that show a genuine issue for trial." *Leisek v. Brightwood Corp.*, 278 F.3d 895, 898 (9th Cir.2002) (*citing Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). The non-moving party may not rely upon mere allegations or denials in the pleadings but must set forth specific facts showing that there exists a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A plaintiff must "produce at least some significant probative evidence tending to support" the allegations in the complaint. *Smolen v. Deloitte, Haskins & Sells*, 921 F.2d 959, 963 (9th Cir.1990). A court "need not examine the entire file for evidence establishing a genuine issue of fact, where the evidence is not set forth in the opposing papers with adequate references so that it could conveniently be found." *Carmen v. San Francisco Unified School District*, 237 F.3d 1026, 1031 (9th Cir.2001). This is true even when a party appears *pro se*. *Bias v. Moynihan*, 508 F.3d 1212, 1219 (9th Cir.2007).

■ Where the nonmoving party is *pro se*, a court must consider as evidence in opposition to summary judgment all contentions "offered in motions and pleadings, where such contentions are based on personal knowledge and set forth facts that would be admissible in evidence, and where [the party appearing pro se] attested under penalty of perjury that the contents of the motions or pleadings are true and correct." *Jones v. Blanas*, 393 F.3d 918, 923 (9th Cir.2004) (citation omitted),

*cert. denied*, 546 U.S. 820, 126 S.Ct. 351, 163 L.Ed.2d 61 (2005).

## DISCUSSION

### A. Eighth Amendment

■ Mr. Garnica argues that the Defendants violated his Eighth Amendment rights by denying him calorically and nutritionally adequate meals during the 2010 Ramadan fast. ECF No. 48, p. 2.

■ Inmates alleging Eighth Amendment violations based on prison conditions must demonstrate that prison officials were deliberately indifferent to their health or safety by subjecting them to a substantial risk of serious harm. *Farmer v. Brennan*, 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994); *Wallis v. Baldwin*, 70 F.3d 1074, 1076 (9th Cir.1995). Prison officials display a deliberate indifference to an inmate's well-being when they consciously disregard an excessive risk of harm to the inmate's health or safety. *Farmer*, 511 U.S. at 838–40, 114 S.Ct. 1970; *Wallis*, 70 F.3d at 1077. The Eighth Amendment standard requires proof of both an objective and a subjective component. *Hudson v. McMillian*, 503 U.S. 1, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992). If either of these components is not established, the court need not inquire as to the existence of the other. *Helling v. McKinney*, 509 U.S. 25, 35, 113 S.Ct. 2475, 125 L.Ed.2d 22 (1993).

■ First, the deprivation alleged must objectively be sufficiently serious, resulting in a denial of the "minimal civilized measures of life's necessities." *Farmer*, 511 U.S. at 834, 114 S.Ct. 1970 (*quoting Rhodes v. Chapman*, 452 U.S. 337, 347, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981)). In proving the objective component, an inmate must establish that there was both some degree of actual or potential injury, and that society considers the [acts] that

the plaintiff complains of to be so grave that it violates contemporary standards of decency to expose anyone unwillingly [to those acts]. *Helling*, 509 U.S. at 36, 113 S.Ct. 2475; *see also Estelle v. Gamble*, 429 U.S. 97, 102, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976).

■ Second is the subjective component that the prison official possesses a sufficiently culpable state of mind: "deliberate indifference to inmate health and safety." *Farmer*, 511 U.S. at 834–36, 114 S.Ct. 1970. With regard to deliberate indifference, a prison official is not liable "unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837, 114 S.Ct. 1970. The subjective component requires proof that the official was: (1) aware of the facts that would lead a reasonable person to infer the substantial risk of serious harm; (2) actually made the inference that the substantial risk of serious harm to the plaintiff existed; and (3) knowingly disregarded the risk. *Id.; see also Farmer*, 511 U.S. at 844, 114 S.Ct. 1970.

With regard to food, the courts have concluded, "the Eighth Amendment requires only that prisoners receive food that is adequate to maintain health; it need not be tasty or aesthetically pleasing." *LeMaire v. Maass*, 12 F.3d 1444, 1456 (9th Cir.1993) (citation omitted). Only those conditions of confinement that deny a prisoner "the minimal civilized measure of life's necessities are sufficiently grave to form the basis of an Eighth Amendment violation." *Id. (quoting Hudson v. McMillian*, 503 U.S. 1, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992)). Although the Ninth Circuit has provided no guidance on the quantity of prisoner food necessary to pass

constitutional muster, other courts have established guidelines. *See, e.g., Green v. Ferrell*, 801 F.2d 765, 770–71 (5th Cir.1986) (finding two meals a day sufficient if nutritionally and calorically adequate); *see also Sostre v. McGinnis*, 442 F.2d 178, 186, 193–94 (2d Cir.1971) (finding diets of 2,800 to 3,300 calories per day constitutionally adequate), *overruled on other grounds in Davidson v. Scully*, 114 F.3d 12 (2d Cir. 1997); *Cunningham v. Jones*, 667 F.2d 565, 566 (6th Cir.1982) (finding one meal a day for 15 days, where the meal contained 2,000 to 2,500 calories and was sufficient to maintain health, constitutionally adequate).

The record reflects that Defendants made mistakes in the packaging and calculations of the 2010 Ramadan box meals, but the errors were corrected prior to or at the start of Ramadan. For example, on August 10, 2010, after he reviewed labels of both Ramadan box meals, Defendant Jackson realized that the calories indicated on the labels did not reflect the original caloric values that had been planned for the Ramadan box meals. ECF No. 39–1, Exhibit 1, Jackson Decl., ¶¶ 10–11; *id.* Attachment A. After the nutritional information was re-entered, it was discovered that the meals actually contained more calories than what was reflected on their labels, but that the caloric level was still too low. *Id.*, ¶ 12. On the same day, Mr. Jackson notified all food service managers that the actual calories for the "Ramadan box is less than 2600 calories and additions will need to be made to make up for these calories." Mr. Jackson's email contained detailed instructions as to how the food service managers should account for the calories, including providing offenders with one of two options of brown bag snacks in addition to the Ramadan box. ECF No. 39–1, Exhibit 1, Jackson Decl., Attachment C, p. 16. With the supplements provided with the lunch tray, the average daily calo-

ries provided during Ramadan was 2724 calories. *Id.,* ¶ 16. According to Mr. Jackson, 2700 calories is well above the recommendations set out by the USDA Dietary Reference Intakes (DRIs), and vegetarian offenders were provided with an additional 1000 calories in the form of two green snacks and two blue snacks to make for any calories lost by not eating meat. ECF No. 39–3, Exhibit 3, Calley Decl., ¶ 7. Thus, Mr. Garnica was not being deprived of adequate nutrition.

According to CBCC's food service manager Jamie Calley, the first Ramadan meal was handed out at CBCC on August 10, 2010, the day before Ramadan was set to begin. On that day, the offenders observing Ramadan would have received their standard three meals in addition to the Ramadan box meal for August 10, 2010. On August 11, 2010, the Ramadan participants would have received the Ramadan box meal and the supplemental food items described in the second option in Mr. Jackson's August 10, 2010 email. Thus, there was only, at most, a one day delay in providing the supplemental food items needed to provide the inmates with a meal containing the full amount the average daily calories. ECF No. 39–3, Exhibit 3 Calley Declaration, ¶¶ 6–8. According to Mr. Jackson, the average daily amount of calories provided during Ramadan was 2,724. ECF No. 38–1, Exhibit 1 (Jackson Decl.), p. 5, ¶ 16.

Mr. Garnica claims that implementation of DOC's policies relating to Ramadan 2010 restricted him to one 1300 edible calorie box meal that caused him to suffer notable weight loss, diminished health and pain, in violation of the Eighth Amendment. ECF No. 1–2, p. 79. Mr. Garnica's claimed weight loss of 15 pounds does not appear to be disputed although Defendants dispute that his weight loss was caused by the consumption of the Ramadan box

meals and supplemental snacks. ECF No. 39–2, Exhibit 2, Carney Decl., ¶ 19. The dispute is not material, however, because Mr. Garnica's medical records do not support a claim of a serious medical condition nor do they support a claim that Defendants were indifferent to Mr. Garnica's health.

Mr. Garnica's medical records reflect that he was seen at least three times for medical complaints during Ramadan 2010. ECF No. 49, Garnica Decl., ¶ 30; pp. 70. His complaints included diarrhea, fatigue, nausea, stomach cramps, pain in his left side radiating down his leg and testicle, a neck and shoulder rash, and headache. *Id.* Also Mr. Garnica complains that he lost 15 pounds during the 2010 Ramadan fast, but also states that he was medically diagnosed as obese and complains that he was refused a diet to lose weight. ECF No. 49, Garnica Decl., ¶ 44.

The record does not reflect, however, that Mr. Garnica was denied appropriate medical treatment for his complaints. Neither does not record reflect that Mr. Garnica suffered any unnecessary pain or injury related to the food served during Ramadan 2010. Even if the Court were to assume that his ailments were related to the food, or lack of food, served during Ramadan 2010, there is nothing to indicate that these ailments were serious enough to endanger Mr. Garnica's health or safety.

Mr. Garnica's caloric calculations are also internally inconsistent and impossible to confirm. For example, in his complaint, he states that he was limited to "one 1300 edible calorie box meal" per day during Ramadan 2010. ECF No. 1–2, p. 79. In his Declaration, he states that on the days he received the Salami Fasting Tray and snacks, and after subtracting the caloric value of "meat or animal products" and the confiscated snacks, he was left with only 397 calories to eat every other day during

the thirty day fast. ECF No. 49, Garnica Decl., ¶ 23. It is impossible to confirm that the items Mr. Garnica subtracts from his caloric formulae contain animal products or are otherwise "inedible."

Mr. Garnica also fails to identify the person or persons who allegedly confiscated the snacks given to him that were meant to add an additional 1000 calories to account for the calories he would lose by not consuming meat. In fact, there is absolutely no evidence that the named Defendants were the ones who allegedly confiscated items from his food tray. It is also not clear exactly what was confiscated except that the figures provided by Mr. Garnica indicate that less than all of the snacks were confiscated. A "conclusory self-serving affidavit, lacking detailed facts and any supporting evidence, is insufficient to create a genuine issue of material fact." *F.T.C. v. Publ'g Clearing House, Inc.*, 104 F.3d 1168, 1171 (9th Cir.1997). The Court also notes that while Mr. Garnica diligently complained during Ramadan 2010 about the nutritional content of the box meals and snacks, there is no evidence that he ever complained to the Defendants that someone was confiscating his snacks.

■ Mr. Garnica must also provide admissible evidence that the Defendants acted with deliberate indifference tantamount to criminal recklessness. *See Farmer*, 511 U.S. at 836, 114 S.Ct. 1970. A "prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 836, 114 S.Ct. 1970. In addition, "prison officials who actually knew of a substantial risk to

inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." *Id.*, at 844, 114 S.Ct. 1970.

The record reflects that Defendants acted with the intent to provide Mr. Garnica and other Ramadan participants with the proper nutrition and calories during Ramadan 2010. They corrected the caloric values of the Ramadan meals and when that was not sufficient, they added supplements to the meals to ensure that the goal of 2700 average calories was met. Mr. Garnica provides no competent summary judgment evidence to the contrary.

■ Plaintiff has no Eighth Amendment right to meals of his choice. Rather, his right extends to food that is adequate to maintain his health. *LeMaire*, 12 F.3d at 1456. He has no constitutional right to be served a hot meal. *See., e.g., Cunningham v. Jones*, 567 F.2d 653, 659–60 (6th Cir. 1977). There is no medically competent evidence indicating that the food provided to him during Ramadan 2010 was inadequate to maintain his health. Even assuming that Mr. Garnica lost 15 pounds and suffered from occasional diarrhea, constipation, and headaches, the evidence presented here indicates that he was seen by a DOC medical professional and was treated for his complaints at that time. There is also no evidence that Mr. Garnica sought medical treatment for his weight loss or indeed that the weight loss posed an immediate danger to his health and well being.

Viewing the foregoing evidence in the light most favorable to Mr. Garnica, the undersigned concludes that he has failed to raise a genuine issue of material fact to establish a serious medical need based on his consumption of the food provided during the 2010 Ramadan fast or that Defendants acted with "deliberate indifference" to his health and safety. Thus, the under-

signed recommends that Mr. Garnica' Eighth Amendment be dismissed.

## B. RLUIPA Claims

42 U.S.C. § 2000cc is the Religious Land Use and Institutionalized Persons Act (RLUIPA). RLUIPA provides that:

> No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution ... even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person—
>
> (1) is in furtherance of a compelling governmental interest; and
>
> (2) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000cc–1(a).

Defendants cannot be held liable under RLUIPA for monetary damages in their official or individual capacity. Furthermore, any request for injunctive relief under RLUIPA is now moot as the evidence reflects that any issues relating to the Ramadan meals were resolved prior to the commencement of Ramadan 2010, which has already passed.

### (1) Monetary Damages—Official Capacity Defendants

 The Eleventh Amendment to the United States Constitution bars citizens from bringing lawsuits against states in federal courts. *See Welch v. Texas Dept. of Highways and Public Transp.,* 483 U.S. 468, 472–73, 107 S.Ct. 2941, 97 L.Ed.2d 389 (1987) (plurality opinion); *Edelman v. Jordan,* 415 U.S. 651, 662–63, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974). A state agency is not a "person" under 42 U.S.C. § 1983, nor is a state official acting in his or her official capacity. *Will v. Michigan Dep't of State Police,* 491 U.S.

58, 71, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989). "[A] suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office. As such, it is no different from a suit against the State itself." *Id.* (citations omitted); *see Edelman,* 415 U.S. at 662–63, 94 S.Ct. 1347. A state cannot be sued by a citizen of that state in federal court. *Will,* 491 U.S. at 70, 109 S.Ct. 2304. The fact that the state is not a named party in an action does not necessarily mean that the state is not a party. *Leer v. Murphy,* 844 F.2d 628, 631 (9th Cir.1988).

The Supreme Court in *Sossamon v. Texas,* — U.S. ——, 131 S.Ct. 1651, 179 L.Ed.2d 700 (2011), expressly held that States do not consent to suit for money damages under RLUIPA "because no statute expressly and unequivocally includes such a waiver." *Id.* at 1663. The Supreme Court found that Congress, by using the phrase "appropriate relief," did not clearly manifest an intent to include a damages remedy when the defendant is a sovereign. *Id.* at 1659–60. Moreover, even before the *Sossamon* decision, the Ninth Circuit Court of Appeals held that RLUIPA does not authorize monetary damages against defendants in their official capacity. *Holley v. Cal. Dep't of Corr.,* 599 F.3d 1108, 1112 (9th Cir.2010).

 All of the Defendants are State employees, therefore, any judgment against them in their official capacities would be paid by the State of Washington. See RCW 70.02; RCW 4.92.075. The State of Washington is the real party in interest; therefore, Plaintiff cannot seek damages from any of the Defendants in their official capacity. The Eleventh Amendment bars Plaintiff's suit for official-capacity damages under RLUIPA. *Holley,* 599 F.3d at 1112.

■ Mr. Garnica's RLUIPA claim against the DOC must also be dismissed because he has failed to show that his right to practice his religion was substantially burdened.

■ Under RLUIPA, a plaintiff "bears the initial burden of going forward with evidence to demonstrate a prima facie claim" that the challenged state action constitutes "a substantial burden on the exercise of his religious beliefs." *Warsoldier v. Woodford,* 418 F.3d 989, 994 (9th Cir.2005) (citing *Cutter,* 125 S.Ct. at 2119). "[A] burden is substantial under RLUIPA when the state denies [an important benefit] because of conduct mandated by religious belief, thereby putting substantial pressure on an adherent to modify his behavior and to violate his beliefs." *Shakur v. Schriro,* 514 F.3d 878, 888 (9th Cir.2008) (internal quotes omitted). A "'substantial burden' on 'religious exercise' must impose a significantly great restriction or onus upon such exercise." *San Jose Christian Coll. v. City of Morgan Hill,* 360 F.3d 1024, 1034 (9th Cir.2004). the Supreme Court has found a substantial burden as "where the state . . . denies [an important benefit] because of conduct mandated by religious belief, thereby putting substantial pressure on an adherent to modify his behavior and to violate his beliefs." *Thomas v. Review Bd. of the Ind. Employment Sec. Div.,* 450 U.S. 707, 717–18, 101 S.Ct. 1425, 67 L.Ed.2d 624 (1981) (ruling in First Amendment context). Although such "compulsion may be indirect, the infringement upon free exercise is nonetheless substantial." *Id.* at 718, 101 S.Ct. 1425.

As noted above, the evidence reflects that the DOC provided Mr. Garnica and other Ramadan participants with a daily meal and supplements during the 2010 Ramadan fast, which contained an average 2700 calories and vegetarian participants received additional snacks to compensate for meat items that they are unable to consume. Mr. Garnica provides no competent summary judgment evidence to the contrary. Although it is clear that Mr. Garnica was not satisfied with the quality or quantity of the food provided, he fails to show that the quality or quantity of the food that he was provided constituted a "substantial burden" on his fast or in the exercise of any other religious belief. For example, there is no evidence that he was not allowed to participate in Ramadan, the fast, prayers, reading of the Qur'an or in any other religious activities. Mr. Garnica argues that the failure to provide him with "food consistent with his vegetarian diet" caused him to "become sick, seek medical care, engage in quarrels, [break] his fast, fatigue, naseau, which placed a substantial burden on plaintiff to abandon his religious beliefs" because he was being served only 929 calories one day and 397 calories the next day for 30–days. ECF No. 48, p. 23. These conclusory allegations are not supported with evidence nor do they establish that the DOC placed a substantial burden on the exercise of Mr. Garnica's religious beliefs.

The evidence reflects that one meal that contained approximately 1900 calories due to a mistake in packaging the 2010 Ramadan meals, but the mistake was corrected the next day and thereafter, Mr. Garnica was given calorically and nutritionally adequate meals throughout the 2010 Ramadan fast. Therefore, whatever negligible burden there may have been on Mr. Garnica's ability to exercise his religious beliefs due to the meals he was served, this burden was not substantial.

(2) **Monetary Damages—Individual Capacity Defendants**

The Ninth Circuit has not ruled on whether RLUIPA allows for money dam-

age claims against state actors in their individual capacity. *Florer v. Congregation Pidyon Shevuyim, N.A.,* 639 F.3d 916, 922 n. 3 (9th Cir.2011) ("[t]he Ninth Circuit has not ruled on this issue in a precedential opinion, and we reserve this question for another day"). But in *Florer,* the Ninth Circuit observed that the Fifth, Seventh, and Eleventh Circuits have held that RLUIPA does not provide for individual-capacity claims for damages against prison officials. *Id.* (*citing Sossamon v. Lone Star State of Texas,* 560 F.3d 316, 328–29 (5th Cir.2009); *Nelson v. Miller,* 570 F.3d 868, 889 (7th Cir.2009); and *Smith v. Allen,* 502 F.3d 1255, 1272 [11th Cir.2007]). The Fourth Circuit has likewise ruled that individuals cannot be sued in their individual capacity for damages under RLUIPA. *Rendelman v. Rouse,* 569 F.3d 182, 188–89 (4th Cir.2009).

Even absent Ninth Circuit case law squarely addressing the issue, numerous district courts within this Circuit have found that RLUIPA does not provide for individual-capacity damage claims. *See, e.g., Florer v. Bales–Johnson,* 752 F.Supp.2d 1185, 1205–1206 (W.D.Wash. 2010); *Shilling v. Crawford,* 536 F.Supp.2d 1227, 1234 (D.Nev.2008); *Brown v. Vail, et al.,* No. CV–08–5091–JPH, 2009 WL 2253334 (E.D.Wa. Jul. 28, 2009) (order on motion to dismiss); *Harris v. Schriro,* 652 F.Supp.2d 1024, 1030 (D.Ariz.2009).

Mr. Garnica's claims arise under Section 3 of RLUIPA, which provides that no government may impose a substantial burden on a prisoner's religious exercise, even if the burden results from a rule of general applicability, unless the government shows that the burden furthers a compelling governmental interest and is the least restrictive means of doing so. 42 U.S.C. § 2000cc–1(a). "This section applies in any case in which ... (1) the substantial burden is imposed in a program or activity that receives Federal financial assistance; or (2) the substantial burden affects, or removal of that substantial burden would affect, commerce with foreign nations, among the several States, or with Indian tribes." 42 U.S.C. § 2000cc–1(b)(1, 2). Thus, Section 3 of RLUIPA was enacted pursuant to Congress's powers under the Spending Clause and the Commerce Clause. *See Cutter v. Wilkinson,* 544 U.S. 709, 715–16, 125 S.Ct. 2113, 161 L.Ed.2d 1020 (2005).

In this case, there are no allegations or evidence that "the substantial burden affects ... commerce with foreign nations, among the several States, or with Indian tribes." 42 U.S.C. § 2000cc–1(b)(2). Consequently, Plaintiff's claims—that Defendants denied him religious practices and failed to accommodate his religious diet—do not implicate the Commerce Clause, and RLUIPA is analyzed solely as an exercise of Congress's Spending Clause power. *Smith v. Allen,* 502 F.3d 1255, 1274, n. 9 (11th Cir.2007); *Sossamon,* 560 F.3d at 328–29, n. 34.

RLUIPA was enacted under the Spending Clause and is akin to a contract between governmental entities. *Smith,* 502 F.3d at 1273–75 (citing *Cutter,* 544 U.S. at 715–16, 125 S.Ct. 2113, and *Pennhurst State Sch. & Hosp. v. Halderman,* 451 U.S. 1, 17, 101 S.Ct. 1531, 67 L.Ed.2d 694 [1981]). The State of Washington may willingly accept federal funds in exchange for abiding by RLUIPA; however, its individual employees do not. State employees acting in their individual capacities are not recipients of federal funds and should not be held liable for damages. Only the State is the recipient of federal funds; therefore, only the state can be held liable for a violation of RLUIPA. *Sossamon,* 560 F.3d at 328, citing, *Smith,* 502 F.3d at 1272–73. According to the Seventh Circuit, "[c]onstruing RLUIPA to

provide for damages actions against officials in their individual capacities would raise serious questions regarding whether Congress had exceeded its authority under the Spending Clause." *Nelson,* 570 F.3d at 889.

This Court agrees that it is appropriate to interpret RLUIPA as an exercise of Congress's Spending Clause Power and to adopt the reasoning of the Eleventh Circuit and numerous other courts and concludes that the individual Defendants cannot be held liable for money damages in their individual capacities in an action under RLUIPA. Accordingly, Defendants are entitled to summary judgment on this claim.

### (3) RLUIPA Claim Is Moot

 Mr. Garnica's remaining claim under RLUIPA is for injunctive relief. However, this claim is now moot as Ramadan 2010 has long since passed.

 The jurisdiction of a federal court depends on the existence of a live case or controversy. *Mitchell v. Dupnik,* 75 F.3d 517, 527 (9th Cir.1996). Courts do not decide questions that cannot affect the rights of litigants in the cases before them. *Id.* at 528. If an issue in a case is no longer in dispute, or a party receives the requested relief, then the issue may be moot. The exception to the mootness doctrine for claims capable of repetition yet evading review is not applicable here, because Mr. Whitman makes no showing that he meets the narrow exemption to mootness doctrine. *See City of L.A. v. Lyons,* 461 U.S. 95, 109, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983); *Smith v. Hundley,* 190 F.3d 852, 855 (8th Cir.1999)

The record reflects that the Defendants resolved all issues as to the caloric amounts of the Ramadan fast trays, along with additional supplements for vegetarians, prior to the commencement of Rama-

dan 2010. The evidence also reflects that those caloric amounts were nutritionally adequate. There is no competent evidence to support Mr. Garnica's allegation against any of the named Defendants that he was intentionally deprived of the calories intended for all vegetarian offenders during 2010 Ramadan. The undersigned recommends that Mr. Garnica's claims under RLUIPA should be dismissed as moot.

### C. First Amendment

 In order to implicate the Free Exercise Clause, the inmate's belief must be religious in nature and sincerely held. See *Malik v. Brown,* 16 F.3d 330, 333 (9th Cir.1994) (internal quotations and citation omitted); *Shakur v. Schriro,* 514 F.3d 878, 884–85 (9th Cir.2008) (adopting the "sincerity test" set forth in *Malik, supra*). The Defendants do not dispute that Mr. Garnica's beliefs are religious in nature and that they are sincerely held.

 Inmates with such beliefs have "[t]he right to exercise [their] religious practices and beliefs...." *McElyea v. Babbitt,* 833 F.2d 196, 197 (9th Cir.1987) (per curiam) (citing *O'Lone v. Estate of Shabazz,* 482 U.S. 342, 348, 107 S.Ct. 2400, 96 L.Ed.2d 282 (1987)). A free exercise violation occurs when the defendants burden the practice of an inmate's religion by preventing the inmate from engaging in sincere religious conduct. See *Freeman v. Arpaio,* 125 F.3d 732, 736 (9th Cir.1997), *overruled in part by Shakur,* 514 F.3d at 885. A mere inconvenience does not give rise to a violation; the burden imposed must be substantial. *Freeman,* 125 F.3d at 737.

 A restriction on an inmate's First Amendment religious rights is valid if it is reasonably related to legitimate penological interests. See *O'Lone,* 482 U.S. at 349, 107 S.Ct. 2400 (*quoting Turner v. Safley,*

482 U.S. 78, 89, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987)). The burden is on the prison officials to prove that the restriction of the prisoner's exercise of religion was reasonably related to a legitimate penological objective. *See Ashelman v. Wawrzaszek,* 111 F.3d 674, 677–78 (9th Cir.1997) (applying test from *O'Lone and Turner* to determine reasonableness of decision denying Jewish prisoner's request for an all kosher diet). In making such a determination, the district court should consider four factors:

> First, there must be a valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it, and the governmental objective itself must be a legitimate and neutral one. A second consideration is whether alternative means of exercising the right on which the regulation impinges remains open to prison inmates. A third consideration is the impact accommodation of the asserted right will have on guards, other inmates, and the allocation of prison resources. Finally, the absence of ready alternatives is evidence of the reasonableness of a prison regulation.

*Allen v. Toombs,* 827 F.2d 563, 567 (9th Cir.1987) (citing *Turner,* 482 U.S. at 89–91, 107 S.Ct. 2254).

 Mr. Garnica's First Amendment claim fails. First, as discussed above, the evidence does not support Mr. Garnica's claim that his nutritional needs were not being met or that Defendants knowingly deprived him of calories because of his religion. Further, Mr. Garnica has not shown that he was substantially burdened in the practice of his religion. He alleges only that the implementation of the Rama-

dan 2010 policy "substantially diminished the spiritual experience of Ramadan, prevented plaintiff from or otherwise distracted plaintiff from the spiritually uplifting aspects of the Ramadan observance...." ECF No. 1–1, p. 30. These conclusory statements fall far short of establishing a substantial burden.

Viewing the foregoing in the light most favorable to Mr. Garnica, the undersigned concludes that Mr. Garnica has failed to raise a genuine issue of material fact as to his claim that the Ramadan 2010 policies and meals burdened the practice of his religion. As noted above, the evidence does not support Mr. Garnica's characterization of the amount of calories in the Ramadan meals or the effect of those calories. Moreover, if he was still hungry during the fast, he had access to additional food[3]. *See, e.g., Patel v. U.S. Bureau of Prisons,* 515 F.3d 807, 810–12 & n. 8 (8th Cir.2008) (prison's meal plan regulations did not substantially burden Muslim inmate's free exercise rights where inmate had access to only vegetarian entrees and some of those entrees he had to pay for himself).

Mr. Garnica also claims that the defendants also burdened the practice of his religion by failing to schedule the Eid ul-Fitr feast in a timely manner. As discussed below, this claim must be dismissed because Mr. Garnica failed to exhaust his administrative remedies regarding this claim. Moreover, the record does not reflect that any of the Defendants were involved in the scheduling or planning of the Eid ul-Fitr feast. In fact, according to Chaplain Duncan, the rescheduling and ultimate cancelling of the Eid ul-Fitr feast was done at the express request of the

---

**3.** Defendants mistakenly attached copies of store orders for Harry Whitman and did not provide evidence of Mr. Garnica's store purchases during the 2009 Ramadan fast. Mr. Garnica does not, however, dispute that he had access to the prison store and could purchase additional food items.

designated leader of the Islamic group. ECF No. 39–5, Duncan Decl., ¶¶ 14, 16.

Based on the foregoing, the undersigned concludes that Mr. Garnica has not demonstrated that the Defendants burdened the practice of his sincere religious practices. Therefore, the Court need not reach the *Turner* analysis. The undersigned recommends that Defendants' motion for summary judgment on this claim be granted.

## D. Claims Relating to Eid Ul Feast—Failure to Exhaust

The PLRA at 42 U.S.C. § 1997e(a) mandates that:

> No action shall be brought with respect to prison conditions under section 1983 of this title or any other Federal law, by a prisoner confined in any jail, prison or other correction facility, until such administrative remedies as are available are exhausted.

In interpreting § 1997(e)(a), the United State Supreme Court determined that Congress enacted this provision in order to reduce the quantity and improve the quality of prisoner suits. *Porter v. Nussle*, 534 U.S. 516, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002). By mandating exhaustion, Congress enabled corrections officials to address prisoner complaints internally, often resulting in the correction of administrative problems, the filtering out of frivolous claims, and ultimately a clear record of the controversy. *Id.* Where exhaustion was once discretionary, it is now mandatory. *Id.* "All 'available' remedies must now be exhausted; those remedies need not meet federal standards, nor must they be 'plain, speedy, and effective.'" *Id.* (quoting *Booth v. Churner*, 532 U.S. 731, 739, 121 S.Ct. 1819, 149 L.Ed.2d 958 [2001]). Section 1997e(a)'s exhaustion requirement applies to all prisoners seeking redress for prison circumstances or occurrences. *Id.* at 520, 122 S.Ct. 983. An inmate must

attempt to fully exhaust available administrative remedies in a timely manner. *Woodford v. Ngo*, 548 U.S. 81, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006). Failure to exhaust administrative remedies generally results in dismissal without prejudice. *Wyatt v. Terhune*, 315 F.3d 1108, 1120 (9th Cir.2003).

An offender in DOC's custody can file a grievance for a wide range of aspects of his incarceration, including for the actions of staff. ECF No. 39–6, Exhibit 6, Declaration of Candy Curl, Grievance Program Manager, ¶ 4. The grievance procedure consists of four levels of review:

> Level 0—Complaint or informal level. The grievance coordinator at the prison receives a written complaint from an offender on an issue about which the offender wishes to pursue a formal grievance. At this complaint level, the grievance coordinator pursues informal resolution, returns the complaint to the offender for rewriting, returns the complaint to the offender requesting additional information, or accepts the complaint and processes it as a formal grievance.

> Level I—Grievances against policy, procedure, or other offenders, and grievances processed as emergencies. The local grievance coordinator is the respondent at this level.

> Level II—Appeal. Offenders may appeal Level I grievances to this level. Staff conduct grievances are initiated at this level. All appeals and initial grievances received at Level II are investigated, with the prison superintendent being the respondent.

> Level III—Appeal. Offenders may appeal all Level II responses except emergency grievances to Department headquarters in Tumwater, where they are

reinvestigated. Administrators are the respondents.

*Id.,* ¶ 6.

Mr. Garnica alleges that the Eid ul-Fitr feast to celebrate the completion of Ramadan was not held within three days of completion of Ramadan in 2010. This allegation is a grievable issue under the DOC grievance system. *Id.,* ¶ 10. Although Mr. Garnica has access to a grievance procedure, he failed to complete the grievance process with respect to the timing of the 2010 Eid ul-Fitr feast. Mr. Garnica did file a grievance regarding the 2010 Ramadan meal box (Grievance No. 1016811), but he filed no grievance regarding the timing or scheduling of the Eid ul-Fitr feast. *Id.,* ¶¶ 12–13; Attachment A.

Because Mr. Garnica failed to timely file a grievance regarding this portion of his complaint, the undersigned recommends that his claims relating to the timing of the Eid ul-Fitr feast be dismissed without prejudice for failure to exhaust.

### E. Fourteenth Amendment Claims

#### 1) Due Process

 The Due Process Clause of the Fourteenth Amendment protects prisoners from being deprived of life, liberty, or property without due process of law. *Wolff v. McDonnell,* 418 U.S. 539, 556, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974). "The requirements of procedural due process apply only to the deprivation of interests encompassed by the Fourteenth Amendment's protection of liberty and property." *Board of Regents v. Roth,* 408 U.S. 564, 569, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). State statutes and prison regulations may grant prisoners liberty interests sufficient to invoke due process protections. *Meachum v. Fano,* 427 U.S. 215, 223–27, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976). However, the Supreme Court has significantly limited the instances in which due process can be invoked. Pursuant to *Sandin v. Conner,* 515 U.S. 472, 483, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995), a prisoner can show a liberty interest under the Due Process Clause of the Fourteenth Amendment only if he alleges a change in confinement that imposes an "atypical and ·significant hardship ... in relation to the ordinary incidents of prison life." *Id.* at 484, 115 S.Ct. 2293 (citations omitted); *Neal v. Shimoda,* 131 F.3d 818, 827–28 (9th Cir.1997).

Therefore, to establish a due process violation, a plaintiff must first show the deprivation imposed an atypical and significant hardship on him in relation to the ordinary incidents of prison life. *Sandin,* 515 U.S. at 483–84, 115 S.Ct. 2293. A plaintiff must allege "a dramatic departure from the basic conditions" of his confinement that would give rise to a liberty interest before he can claim a violation of due process. *Id.* at 485, 115 S.Ct. 2293; *see also Keenan v. Hall,* 83 F.3d 1083, 1088–89 (9th Cir.1996), amended by 135 F.3d 1318 (9th Cir.1998).

Mr. Garnica has not alleged any facts to support a claim that he was deprived of a protected interest without procedural due process nor has he identified what process to which he believes he is entitled. Defendants are entitled to summary judgment on this claim.

#### 2) Equal Protection

 The Equal Protection Clause "is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne, Tex. v. Cleburne Living Center,* 473 U.S. 432, 439, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985). In order to prevail on an Equal Protection claim, a plaintiff must show ·differential treatment from a similarly situated class, *see Washington v. Davis,* 426 U.S. 229, 239, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976), and "intentional or

purposeful discrimination." *Draper v. Rhay*, 315 F.2d 193, 198 (9th Cir.1963), *cert. denied*, 375 U.S. 915, 84 S.Ct. 214, 11 L.Ed.2d 153 (1963); *City of Cuyahoga Falls v. Buckeye Community Hope Foundation*, 538 U.S. 188, 194, 123 S.Ct. 1389, 155 L.Ed.2d 349 (2003) ("[P]roof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause.") (brackets and internal quotation marks omitted); *Flores v. Morgan Hill Unified School Dist.*, 324 F.3d 1130, 1134 (9th Cir.2003). This "discriminatory purpose" must be clearly shown since a purpose cannot be presumed. *Snowden v. Hughes*, 321 U.S. 1, 8, 64 S.Ct. 397, 88 L.Ed. 497 (1944).

The Equal Protection Clause does not require conditions, practices, and rules at county and state correctional facilities to be identical. *Cooper v. Elrod*, 622 F.Supp. 373 (N.D.Ill.1985). The United States Supreme Court has observed that "showing that different persons are treated differently is not enough without more, to show a denial of Equal Protection." *Griffin v. County Sch. Bd. of Prince Edward County*, 377 U.S. 218, 230, 84 S.Ct. 1226, 12 L.Ed.2d 256 (1964). Moreover, "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Turner v. Safley*, 482 U.S. 78, 89, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987).

A plaintiff must demonstrate that he was "treated differently ... *because* [he] belonged to a protected class." *Seltzer–Bey v. Delo*, 66 F.3d 961, 964 (8th Cir.1995) (citing *Divers v. Department of Corr.*, 921 F.2d 191, 193 (8th Cir.1990)) (emphasis added). Prisoners are not a suspect class. *Moss v. Clark*, 886 F.2d 686 (4th Cir.1989); *see Thornton v. Hunt*, 852 F.2d 526, 527 (11th Cir.1988); *Pryor v. Brennan*, 914 F.2d 921 (7th Cir.1990).

"Ramadan prisoners" are not a suspect class.

Mr. Garnica has failed to allege any facts or provide evidence to raise a genuine issue of material fact to support his Equal Protection claim. First, Mr. Garnica cannot demonstrate that he was treated differently from other similarly situated persons, *i.e.*, offenders observing Ramadan. All offenders observing Ramadan were provided with the same Ramadan box meals and supplements which provided sufficient nutritional content. It is undisputed that the 2010 Ramadan policies were implemented throughout DOC. *See, e.g.*, ECF No. 39–1, Exhibit 1, Jackson Decl., Attachment C, p. 16. Mr. Garnica attempts to compare himself to other offenders who were not participating in Ramadan. *See, e.g.*, ECF No. 1–1, p. 43. However, this comparison to non-fasting offenders as "persons similarly situated" is misplaced. The evidence reflects that DOC's mainline alternative meal provides an average of 2830 calories per day and the Ramadan meals provide an average of 2700 calories per day, which are both within DOC guidelines and above USDA dietary recommendations. ECF No. 39–1, Exhibit 2, Carney Decl., ¶ 18. With the supplements provided, the average daily calories provided during Ramadan was 2724 calories. ECF No. 39–1, Exhibit 1, Jackson Decl., ¶ 16. Therefore, Mr. Garnica' claims that he was treated differently than other similarly situated persons fails and his claim of violation of the Equal Protection clause of the Fourteenth Amendment fails. Based on the foregoing, the undersigned recommends that Mr. Garnica's Fourteenth Amendment equal protection claim be dismissed.

**F. Failure to Allege Personal Participation**

Defendants argue that Plaintiff's claims against Defendants Vail, Fraker, and Jack-

son should be dismissed for failure to allege their personal participation. ECF No. 39, p. 26. As to Defendants Fraker and Jackson, the Court finds that Mr. Garnica sufficiently alleged their personal participation.

■ In order to state a civil rights claim, a plaintiff must set forth the specific factual basis upon which he claims each defendant is liable. *Aldabe v. Aldabe,* 616 F.2d 1089, 1092 (9th Cir.1980). A defendant cannot be held liable under 42 U.S.C. § 1983 solely on the basis of supervisory responsibility or position. *Monell v. Dept. of Soc. Serv. of New York,* 436 U.S. 658, 694 n. 58, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978); *Padway v. Palches,* 665 F.2d 965, 967 (9th Cir.1982). Rather, each defendant must have personally participated in the acts alleged. *Id.* "A supervisor is only liable for constitutional violations of his subordinates if the supervisor participated in or directed the violations, or knew of the violations and failed to act to prevent them." *Taylor v. List,* 880 F.2d 1040, 1045 (9th Cir.1989). Vague and conclusory allegations of official participation in civil rights violations are not sufficient to withstand a motion to dismiss. *Pena v. Gardner,* 976 F.2d 469, 471 (9th Cir.1992).

Defendant Fraker personally participated in sending emails to Ramadan participants, DOC superintendents, the chaplain, and Defendant Calley, outlining the procedures for the Ramadan 2010 events at CBCC. ECF No. 37, p. 13, Attachment B. He also responded to Mr. Garnica's September 2, 2010 Level II appeal of Grievance No. 1017899, stating, in part, that the "information gathered and received indicates that according to a review by a dietician, the Ramadan box meal and supplemental sack provide adequate nutrition and calories." ECF No. 27, Attachment E, p. 35. Defendant Jackson is the food manager who was involved in implementing the 2009 Ramadan fasting policies at issue. As discussed above, however, claims against Defendants Fraker and Jackson should be dismissed because Mr. Garnica has failed to show that these defendants violated his constitutional rights.

Mr. Garnica's claims against Defendant Vail should be dismissed for failure to allege personal participation. Mr. Garnica sues Defendant Vail in his supervisory capacity only. Mr. Garnica alleges that he notified Defendant Vail thirty days prior to the 2009 Ramadan fast that the new Ramadan policies would not provide adequate food for participating vegans. ECF No. 48, p. 42. Mr. Garnica argues that Defendant Vail failed to respond and that he should have ordered his subordinates to provide a sufficient vegetarian meal. *Id.* Mr. Garnica provides no factual allegations or evidence to support a claim that Defendant Vail personally participated in depriving him of any constitutional right. Accordingly, Defendant Vail should be dismissed from this action.

### G. DOC is Not a Person Under 42 U.S.C. § 1983

■ A governmental agency that is an arm of the state is not a person for purposes of § 1983. *See Howlett v. Rose,* 496 U.S. 356, 365, 110 S.Ct. 2430, 110 L.Ed.2d 332 (1990); *Flint v. Dennison,* 488 F.3d 816, 824–25 (9th Cir.2007); *Doe v. Lawrence Livermore Nat'l Lab.,* 131 F.3d 836, 839 (9th Cir.1997); *Hale v. Arizona,* 993 F.2d 1387, 1398–99 (9th Cir.1993) (en banc). A state's department of corrections is an arm of the state for purposes of claims brought under 42 U.S.C. § 1983. *See Alabama v. Pugh,* 438 U.S. 781, 782, 98 S.Ct. 3057, 57 L.Ed.2d 1114 (1978) (per curiam) (suit against state Board of Corrections barred by the Eleventh Amendment); *Hale v. Arizona,* 993 F.2d 1387, 1398–99 (9th Cir.1993) (en banc) (Arizona

DOC is an arm of the state not a person for § 1983 purposes); *Gilbreath v. Cutter Biological, Inc.*, 931 F.2d 1320, 1327 (9th Cir.1991). Section 1983 claims against states, therefore, are legally frivolous. *See Jackson v. Arizona*, 885 F.2d 639, 641 (9th Cir.1989) (superseded by statute on other grounds as stated in, *Lopez v. Smith*, 203 F.3d 1122, 1130 (9th Cir.2000) (en banc)).

Mr. Garnica's claims against DOC, other than his claims under RLUIPA, are not claims against persons under 42 U.S.C. § 1983. As discussed above, Mr. Garnica is not entitled to injunctive relief against the DOC under RLUIPA. Therefore, the undersigned recommends that his § 1983 claims against the DOC be dismissed.

## H. Qualified Immunity

■ Defendants argue that they are entitled to qualified immunity with respect to Mr. Garnica's claims. In determining whether qualified immunity applies, the Court may first consider whether "the facts alleged show the [defendant's] conduct violated a constitutional right." *Saucier v. Katz*, 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001), *modified, Pearson v. Callahan*, 555 U.S. 223, 129 S.Ct. 808, 811, 172 L.Ed.2d 565 (2009) ("while the sequence set forth [in *Saucier*] is often appropriate, it should no longer be regarded as mandatory in all cases"). "If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity." *Saucier v. Katz*, 533 U.S. at 201, 121 S.Ct. 2151.

This Court need not address qualified immunity with respect to Mr. Garnica's claims because, as discussed above, he has not established those alleged violations of constitutional rights.

## CONCLUSION

Based on the foregoing, the undersigned recommends that Defendants' Motion for Summary Judgment (ECF No. 39) be **GRANTED;** and that Plaintiff's claims against Defendants be **dismissed with prejudice, except** Plaintiff's claims regarding the 2010 Eid ul-Fitr feast, which should be **dismissed without prejudice for failure to exhaust.**

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from service of this Report to file written objections. See also Fed.R.Civ.P. 6. Failure to file objections will result in a waiver of those objections for purposes of appeal. *Thomas v. Arn*, 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985). Accommodating the time limit imposed by Rule 72(b), the Clerk is directed to set the matter for consideration on **July 12, 2013,** as noted in the caption.

**DATED** this 19th day of June, 2013.